K & M JOINT VENTURE,
Plaintiff-Appellee,

v.

SMITH INTERNATIONAL, INC.,
Defendant-Appellant.

No. 79–3696.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 12, 1981.

Decided Feb. 3, 1982.

Rehearing and Rehearing En Banc
Denied March 29, 1982.

Harry C. Nester, Fred Schwartz, Hahn, Loeser, Freedheim, Dean & Wellman, Neil K. Evans, Cleveland, Ohio, Richard F. Oetting, Gilbert D. Jensen, Voegelin & Barton, Los Angeles, Cal., for defendant-appellant.

Michael A. Cyphert, Thompson, Hine & Flory, William D. Ginn, Cleveland, Ohio, for plaintiff-appellee.

Before EDWARDS, Chief Judge, LIVELY, Circuit Judge, and HOLSCHUH,* District Judge.

LIVELY, Circuit Judge.

In this diversity action the district court awarded damages of $1,492,230 to an Ohio purchaser of equipment from a California seller for breach of an implied warranty of merchantability. The plaintiff-appellee is K & M Joint Venture (K&M) which was formed for the purpose of bidding on a sewer project of the City of Cleveland. After being awarded the contract for the project a principal of K&M contacted an officer of the Calweld Division of defendant-appellant Smith International, Inc. (Calweld) by telephone to learn if he knew of a 12-foot diameter tunnel boring machine (TBM) which K&M might buy for the Cleveland project. K&M eventually bought a 12-foot TBM from Calweld and this lawsuit resulted from that transaction.

I.

The case was tried by the district court without a jury. The complaint sought damages for breach of contract and breach of both express and implied warranties. Calweld filed a motion for summary judgment supported by affidavits of several of its officers and by two documents which it claimed demonstrated that the TBM was sold in "as is" condition and without any warranties. The district court denied the motion for summary judgment, holding that the opposing affidavits of the parties showed the existence of genuine issues of material fact. Calweld then answered, denying generally the allegations of breach of contract and breach of warranty and pleading as affirmative defenses that the sale was made "as is" without warranties and that K&M had failed to notify Calweld promptly of K&M's claim of breach.

There were conflicts in the evidence with respect to the terms under which the TBM was sold. During a series of telephone calls on November 9, 1973, Calweld offered to sell K&M a 12-foot TBM for $90,000.00. The district court found that Richard Wallers, an officer of Calweld, told Ed Kassouf and Emil Dodero, representatives of K&M, that the TBM which it offered for sale was new and fully warranted, but that some of the accessories were used and not warranted. The district court found that these representations were made to Kassouf in one of the telephone calls on November 9, 1973 and were repeated to him and Dodero when they visited the California plant of Calweld on November 28, 1973. The district court further found that an oral contract for sale of the TBM to K&M for $75,000 was made when Kassouf was again in California to view a test of the TBM with its power hooked up about December 17th. The district court found that there was no discussion of warranties during Kassouf's second trip to Calweld's plant, but that there was a meeting of the minds on the basis of the representations made by Wallers during the first visit.

Between Kassouf's two visits to California, Calweld sent a "quotation" to K&M which Kassouf saw. This document listed Item 1, priced at $75,000, "One (1) Calweld 12'0" Diameter Tunnel Boring Machine and

* The Honorable John D. Holschuh, Judge, United States District Court for the Southern District of Ohio, sitting by designation.

Accessories including [listed accessories]. All Equipment is on Calweld stock and is offered in the 'as is' condition." This quotation was dated November 30, 1973. After the second visit to Kassouf, at about the time the TBM was shipped to Cleveland, Calweld sent K&M an invoice which described Item 1 as one used 12-foot TBM and contained the same statement that all equipment was offered in the "as is" condition. K&M did not question the language in either document and it paid for Item 1 without protest.

The TBM was delivered disassembled to K&M, F.O.B. Santa Fe Springs, California on January 18, 1974 and reached K&M in Cleveland on about January 30th. The TBM is a large machine, weighing approximately 30 tons. Upon being lowered into an excavation, it is positioned by means of its six legs against a wall of earth. The TBM then rotates "cutters" against the face of the wall and bores out a tunnel the size of the cutters. It was undisputed that Kassouf told Wallers that the TBM would be used to bore through shale of a kind Wallers was familiar with from an earlier Cleveland project where a Calweld TBM had been used. The 12-foot TBM was lowered into the shaft by K&M on June 25, 1974. The district court found that the TBM "malfunctioned repeatedly" from that date until it was removed for extensive repairs on January 8, 1975. On January 23, 1975 K&M advised Calweld that it was required to rebuild the TBM completely and requested a full set of drawings for the machine. There were a number of discrepancies between the drawings and the TBM as actually constructed. Based on a series of conversations between representatives of K&M and Calweld after problems with the TBM began to appear the district court found that K&M had discharged its burden of proving that adequate notice of Calweld's alleged breach was given within a reasonable time.

## II.

### A.

The TBM transaction was a sale of goods within the meaning of Article 2 of the Uniform Commercial Code (UCC) which was in effect in both Ohio and California. The district court found that the contract was made in California. It was performed there also since delivery was made to K&M F.O.B. Calweld's plant. Further a document styled "Conditions and Terms of Sale" which accompanied the invoice provided, "this order is made and entered into in Los Angeles, California, and shall be construed in accordance with the laws of the State of California."

### B.

On appeal Calweld argues that the finding of the district court that the TBM was sold subject to an implied warranty of merchantability is clearly erroneous. It contends there is no support in the evidence for the district court's finding that the parties intended "as is" merely to mean that Calweld was unwilling to incur further selling expenses by cleaning up some of the accessories and including additional parts requested by K&M. Calweld relies on a provision of UCC § 2–316 which states that use of expressions such as "as is" excludes all implied warranties. It maintains that even if Wallers and another Calweld representative, Uski, stated at the November 28th meeting that the TBM carried the full warranty of new equipment, this was modified by the quotation of November 30, 1973 and the invoice of January 1974. Since there was no discussion of terms of sale other than price at the December 17th meeting, the agreement made at that time was necessarily based on the "offer" contained in the November 30th document, according to Calweld. Calweld further contends that the invoice was not an attempt to change the previous agreement of the parties, as found by the district court. Rather, it was a confirmation of the fact that the TBM was sold in "as is" condition.

K&M responds that the district court merely resolved conflicts in the evidence and its finding that the TBM was sold with an implied warranty of merchantability is not clearly erroneous. Its representatives'

understanding that "as is" referred only to the used equipment and not to the new TBM was "entirely credible" and supported by the evidence, K&M asserts. Further, neither the quotation nor the invoice was effective as a disclaimer of the implied warranty. The finding that in this transaction the expression "as is" had a special meaning different from its use as a disclaimer of warranty was also supported by the evidence in the view of K&M. Thus, it contends, the quotation was not an offer which changed the terms of the previous discussions between the parties, but a mere confirmation of those terms. Finally, K&M agrees with the district court that even if the "as is" language in the invoice was intended to disclaim implied warranties it was ineffective for this purpose since it was written after the parties had agreed.

### C.

Calweld also contends that K&M is barred from recovery by reason of its failure to give adequate and timely notice of Calweld's alleged breach. Calweld argues that, as a matter of law, the communications from K&M concerning the malfunctioning of the TBM did not constitute notice of a breach. It points out that Kassouf called Wallers a number of times to report breakdowns of the TBM and to request advice, but that no demands were made that Calweld repair the machine at its expense or that it furnish replacement parts to K&M free of charge. Calweld further asserts that K&M's conduct was inconsistent with its present claim of a breach of warranty of merchantability. Between June 1974 and January 1975, the period when K&M experienced many difficulties with the TBM, K&M purchased approximately $20,000 worth of repair and replacement parts for the TBM from Calweld. These parts were paid for without any protest. Many of the parts were the products of other manufacturers and could have been purchased directly from them rather than from Calweld. Calweld finds this continuation of the business relationship during this period, and particularly payment for the parts without protest or claim of set-off,

inconsistent with the claim of breach of warranty.

K&M responds to this argument by asserting that it did everything possible to notify Calweld except to "mouth the magic words." It relies on the language of an official comment to the UCC that notice to a seller that the product has proven "troublesome" is sufficient, and discusses factual differences between the present case and some of the decisions relied upon by Calweld. Primarily, however, K&M argues that notice is a question of fact and that the finding of the district court that K&M gave adequate and timely notice is not clearly erroneous.

### III.

At first reading the use of "as is" in the two documents appears to disclaim the existence of implied warranties in connection with the sale of the TBM. Both before and since the adoption of the UCC California has recognized that the use of "as is" may be effective to prevent representations of a seller from being treated as warranties. See *Intrastate Credit Service, Inc. v. Pervo Paint Co.*, 236 Cal.App.2d 547, 46 Cal.Rptr. 182 (1965); *Triple C. Leasing v. All-American Mobile Wash*, 64 Cal.App.3d 244, 134 Cal.Rptr. 328 (1976). However, the use of "as is" does not automatically exclude implied warranties. The language of UCC § 2–316(3)(a) (Cal.Com.Code § 2316(3)(a)) makes this clear:

> (3) Notwithstanding subdivision (2)
>
> (a) *Unless the circumstances indicate otherwise*, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty;

(Emphasis added). We read the district judge's memorandum opinion to mean that he found that the circumstances of the present case indicated "otherwise"; that is, that the use of the words had a special meaning which was different from the usual disclaimer of warranty.

■ There was a sharp conflict in the testimony concerning representations with respect to the TBM at the November 28th meeting. The district court resolved this conflict in favor of K&M by finding that Wallers represented to Kassouf that the TBM was new and would be sold subject to full warranties. The court found that this was consistent with Wallers' representations to Kassouf in a series of telephone conversations on November 9th. The district court further found that Calweld's representatives excluded some of the accessory equipment from the scope of the warranties because the equipment had been used and had been exposed to the elements for a long time. There was evidence to support these findings, giving credit to the witnesses for K&M. Thus, the findings with respect to the November 28th meeting are not clearly erroneous.

■ The district court also found that an oral contract was entered into at the time of Kassouf's second visit to Calweld's plant and that it embodied the terms of the previous discussions. The written quotation which was sent between the two meetings used "as is" only to indicate that Calweld refused to incur any further expenses in consummating the sale of the new TBM or the used equipment according to the district court. This finding was based on Wallers' testimony which was found to be consistent with the previous discussions of the parties and their subsequent agreement. Evidentiary support for this finding is much less clear than for the earlier one that Calweld agreed on November 28th that the TBM would be warranted. The written quotation could easily be construed as amending the original representation and offering the TBM and accessories on an unwarranted basis. However, the existence of a warranty is a question of fact. Calweld did not use its usual sales contract form which spelled out its warranties and their limitations in detail. See *S. M. Wilson & Co. v. Smith International, Inc.,* 587 F.2d 1363, 1366–67 n. 2 (9th Cir. 1978). The district court found that Calweld's usual warranties were not discussed with K&M's representatives.

On the entire record we do not believe the district court erred in finding that the circumstances of this case indicated that "as is," as used in the November 30th document, did not effectively disclaim an implied warranty of merchantability for the TBM. Also, given the court's finding that there was a meeting of the minds on December 17th and that the agreement reached at that time included a new equipment warranty on the TBM, the court did not err in holding that the language in the January 1974 invoice was ineffective to negate the existence of an implied warranty.

### IV.

### A.

■ A buyer who intends to seek recovery from a seller for a claimed breach of warranty must give the seller prompt notice of the claim. UCC § 2–607(3)(a) (Cal.Com. Code § 2607(3)(a)) provides in part:

(3) Where a tender has been accepted

(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; . . .

The district court held that this requirement had been complied with. Though Calweld pled lack of prompt and reasonable notice as an affirmative defense, the district court properly held that the burden of proof on this issue rests upon K&M. As we have noted, K&M takes the position that the findings of the district court with respect to notice are not clearly erroneous and that we are bound to accept them under Rule 52(a), Fed.R.Civ.P., and affirm the judgment. We view the matter differently. We agree that the question of whether any notice was given, and if so, what the notice consisted of and when it was given, is one of fact. However, the question of whether the notice satisfied the statutory requirement is one of law. Thus, the issue of notice in this case presents a mixed question of fact and law. In reviewing mixed findings we are not bound by the clearly

erroneous standard. This was clearly stated in *United States v. Weingarden,* 473 F.2d 454, 460–61 (6th Cir. 1973):

> In our opinion, the finding by the District Court that the sole purpose of the issuance of the summons is for criminal prosecution, is not a finding of fact. It is either a mixed finding of fact and conclusion of law, or it is a finding of the ultimate fact in the making of which is involved legal principles. It is subject to appellate review, and the clearly erroneous rule has no application.

In *Cordovan Associates, Inc. v. Dayton Rubber Co.,* 290 F.2d 858, 860 (6th Cir. 1961), we held:

> "Where a finding designated as a finding of fact is not in reality a finding of fact, but is a conclusion of law or a mixed finding of fact and conclusion of law, it is not binding on the appellate court. *Bogardus v. Commissioner,* 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32; *Weible v. United States,* 9 Cir., 1957, 244 F.2d 158; *Chandler v. United States,* 7 Cir., 1955, 226 F.2d 403. Where a finding is of an ultimate fact in the making of which is involved the application of legal principles, it is subject to review. *Baumgartner v. United States,* 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525."

See also *Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.,* 477 F.2d 150, 154 (6th Cir. 1973); *Glasson v. City of Louisville,* 518 F.2d 899, 903 (6th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975).[1]

### B.

In concluding that the notice given by K&M to Calweld was adequate and timely the district court relied heavily on portions of Official Comment 4 to § 2–607 of the UCC as shown by the following excerpt from its memorandum opinion:

The time of notification is to be determined by applying commercial standards to a merchant buyer. 'A reasonable time' for notification from a retail customer is to be judged by different standards so that in his case it will be extended, for *the rule of requiring notification is designated to defeat commercial bad faith, not to deprive a good faith customer of his remedy.*

*The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched.* There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defect upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. *The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.*

(Emphasis added by district court).

The district court erred in accepting the statement from Comment 4, "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched [ ]," as controlling. In *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957 (5th Cir. 1976), the court was required to apply California law in an action for breach of an agreement for delivery of 99 jet aircraft. The court of appeals found that the district court had erred in holding as a matter of law that the buyer had given adequate and

---

1. The dissent is concerned that we have not dealt properly with the findings of the district court on the issue of the adequacy and timeliness of notice. After careful examination of the record on appeal, the majority concludes that even if the findings with respect to notice were purely factual, it would be necessary to reverse them under the "clearly erroneous" standard of Rule 52(a). This is a case where we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

timely notice of its claim of breach. In reaching this conclusion the court discussed the origins of UCC § 2–607 and its purpose. The critical question under both Section 49 of the Uniform Sales Act, from which UCC § 2–607 was derived, and § 2–607, was found to be "whether the seller had been informed that the buyer considered him to be in breach." *Id.* at 972. The court determined that the basic policies underlying both uniform laws "of encouraging compromise and promoting good faith in commercial relations" are served by requiring prompt notice to the seller that the buyer considers him to be in breach. *Id.*

Given these undeniable purposes, it is not enough under section 2–607 that a seller has knowledge of the facts constituting a non-conforming tender; he must also be informed that the buyer considers him to be in breach of the contract.

*Id.* at 973.

The court specifically rejected the contention that the single quoted sentence from Comment 4 is controlling:

However, the fact that the Code has eliminated the technical rigors of the notice requirement under the Uniform Sales Act does not require the conclusion that any expression of discontent by a buyer always satisfies section 2–607. As Comment 4 indicates, a buyer's conduct under section 2–607 must satisfy the Code's standard of commercial good faith. Thus, while the buyer must inform the seller that the transaction is "still troublesome," Comment 4 also requires that the notification "be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation."

*Id.* at 976. In summary the court held that the buyer's conduct, "taken as a whole, must constitute timely notice that the transaction is claimed to involve a breach." *Id.* at 978 (footnote omitted).

This court has had occasion recently to consider the adequacy of a notice of claimed breach of warranties. *Standard Alliance Industries, Inc. v. Black Clawson Co.,* 587

F.2d 813 (6th Cir. 1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979). Applying Ohio law in a diversity case, we reached the same conclusions concerning the notice requirement of UCC § 2–607 as the court did in *Eastern Air Lines, supra.* Both California and Ohio adopted this section of the uniform code without change. In *Black Clawson* this court stated that the seller knew the buyer was experiencing difficulties with the goods and that a jury might have concluded the seller knew it was in breach of warranty to repair or replace. The critical issue, however, was whether the seller "had notice it was considered to be in breach." 587 F.2d at 825. Rather than relying on the "troublesome" portion in Comment 4, this court emphasized the later statement in the same Comment, "The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction *is claimed to involve a breach,* and thus opens the way for normal settlement through negotiation." (Emphasis added).

Finding that the buyer's communication to the seller failed to inform the seller that a breach was claimed, this court reversed a jury award for the buyer and held as a matter of law that the notice requirement of UCC § 2–607 had not been met. *Black Clawson, supra.* In reaching this result this court agreed with the Fifth Circuit on the underlying policies and purposes of the notice requirement. Both courts concluded that mere notice that a transaction is "troublesome" is not enough. Both also quoted from an opinion of Judge Learned Hand in a pre-UCC case:

The plaintiff replies that the buyer is not required to give notice of what the seller already knows, but this confuses two quite different things. The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.

*American Mfg. Co. v. United States Shipping Board E. F. Corp.*, 7 F.2d 565, 566 (2d Cir. 1925).

*Eastern Air Lines*, 532 F.2d at 972; *Black Clawson*, 587 F.2d at 825. The underpinning of UCC § 2–607 is a requirement of commercial good faith which is met by a prompt notice that the buyer is claiming a breach has occurred.

### C.

Considering the communications from K&M to Calweld in the light of the foregoing principles we conclude that the district court erred as a matter of law. K&M experienced problems with the TBM immediately after it was positioned in an excavation. It called Calweld the next day, June 26, 1974. Kassouf merely sought advice from Wallers in dealing with the problem. From this testimony, giving it the most favorable meaning to K&M, there was not the slightest hint of a claim of breach of warranty. The next problem occurred when the TBM tipped over while being re-positioned following repairs which had been suggested by Wallers. There was no testimony that this problem was even reported to Calweld. Then on July 9, 1974 some of the rolling cutters failed. Wallers was again called, and he advised K&M just to run the TBM as it was. Nevertheless, K&M bought a full set of cutters from another supplier and paid approximately $18,000 for them. These cutters were installed by K&M, but it never made any demand that Calweld replace the failed cutters or pay for the replacements. There was nothing in the contract concerning the cutters which would have given Calweld notice that K&M was claiming a breach.

On July 18, 1974 the side legs of the TBM failed. Kassouf called Wallers to complain, but did not claim a breach. Calweld then offered to send a service representative to look at the TBM. The district court found that while this representative was in Cleveland, Kassouf told him that K&M "intended to hold Calweld responsible for the breakdowns." This occurred on July 19th or 20th. It was not followed by any written notice or any statement to an officer of Calweld though Kassouf and Wallers were in frequent contact. K&M proceeded to make additional repairs on the TBM without any demands on Calweld for payment. On July 26, 1974 Kassouf called Wallers and "explained the situation to him." The "explanation" was a description of a new problem being encountered. Again, Kassouf made no claim of breach of warranty. When Wallers' suggested remedy failed to work, Kassouf again made no demand that Calweld repair the TBM or pay the cost of having it repaired.

In September 1974 Dodero went to the Calweld plant to discuss the problems K&M was having "over a set of blueprints." There was no testimony that Dodero made any demand on Calweld or notified anyone there that K&M was claiming a breach of warranty. On January 8, 1975 the TBM was removed from the job. On January 23rd K&M advised Calweld that it planned to rebuild the TBM completely and requested a complete set of drawings. This was the only written communication from K&M during the entire period from June 1974 until this action was filed. During the rebuilding K&M discovered a number of discrepancies between the drawings and the actual construction of the TBM. Yet, even with this information, K&M never notified Calweld that it was claiming anything from Calweld. The first such notice came when this action was filed eleven months later, seventeen months after the first problems were experienced with the TBM. The fact that K&M continued to order repair and replacement parts from Calweld and to pay for them as billed without protest throughout the period when problems were being experienced is inconsistent with the claim that K&M considered Calweld liable. See *Eastern Air Lines, supra*, 532 F.2d at 978–79. This course of conduct is also inconsistent with the one statement made to Calweld by K&M which even remotely suggested an intent to claim a breach of warranty—the statement early in the period of problems with the TBM to Calweld's service representative that K&M intended to hold Calweld responsible.

Taken as a whole, K&M's conduct did not constitute timely or adequate notification that the transaction was claimed to involve a breach. We find no support in the record for findings of the district court that K&M gave unequivocal notice of its intent to hold Calweld responsible for failure of the TBM to perform satisfactorily and that Calweld failed to take advantage of opportunities for settlement and real negotiations initiated by K&M.

The district court also held that K&M is not a "merchant," and therefore should be held to no higher standard than an ordinary consumer with respect to the adequacy of notice under UCC § 2–607. This determination was based on a finding that K&M had no "specialized knowledge as to the goods," one test set forth in Official Comment 2 to UCC § 2–104 which defines "merchant." [2] However, specialized knowledge of the goods is not the only test in Comment 2. A merchant is also one who has "specialized knowledge as to business practices." It is undisputed that both parties to the K&M joint venture were experienced sewer contractors. The Kassouf Company, one of the joint venturers, had excavated eight tunnels using boring machines before the joint venture was formed. When the Calweld TBM failed, K&M "completely rebuilt" it. Moreover, K&M purchased a new TBM from another supplier during the course of the Cleveland sewer project. In a case applying California law both a contractor and its supplier of specialized equipment were found to be merchants within the meaning of the UCC. See *C. R. Fedrick, Inc. v. Borg-Warner Corp.*, 552 F.2d 852, 855 (9th Cir. 1977). Given K&M's experience in purchasing and operating TBM's on a number of occasions it was

error for the district court not to hold it to the stricter requirement of notice under § 2–607 which applies to merchants. *Eastern Air Lines, supra*, 532 F.2d at 977; *Black Clawson, supra*, 587 F.2d at 827.

## CONCLUSION

At first glance the result in this case may appear harsh, given the undenied problems which K&M experienced with the Calweld TBM. However, K&M was a joint venture composed of experienced contractors who routinely dealt with suppliers of specialized machinery. This was a transaction between two large enterprises, not one in which an individual consumer dealt in a single transaction with a large manufacturer or seller of goods. If Kassouf or someone else acting for K&M had notified Calweld early on that a breach of warranty was claimed Calweld would have had an opportunity to offer to undertake repairs itself, to furnish replacement parts from its stock, or even to negotiate a settlement. If K&M had followed through on Kassouf's July 1974 statement to the Calweld service representative by billing Calweld for the cost of the repairs to that date or by claiming the right to offset its expenses against Calweld's charges for repair and replacement parts, there might be some basis for holding that Calweld was notified of the nature of K&M's claim. But K&M did none of these things. Instead, it continued to attempt to make its bargain TBM [3] work satisfactorily and then when the job was completed filed this action seeking over $3,000,000 in damages from Calweld. K&M, an experienced party, chose to follow a course of conduct which failed to inform Calweld that it was claiming a breach of warranty. Under these circumstances, there is no inequity in

**2.** UCC § 2–104 provides in part:

"Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

**3.** Kassouf knew the 12-foot TBM had been built approximately four years prior to his seeing it and that it had been sitting outside the Calweld plant. K&M paid $75,000 for the TBM, though Kassouf was told that similar equipment ordinarily cost about $300,000 to $325,000. During the course of the contract K&M purchased another TBM from another supplier as a "cover." The cost was $219,000.

requiring it to bear the consequences of its decision. *Cf. Delta Air Lines, Inc. v. Douglas Aircraft Co.*, 238 Cal.App.2d 95, 47 Cal. Rptr. 518 (1966).

The judgment of the district court is reversed with directions to dismiss the complaint. The defendant-appellant will recover its costs on appeal.

HOLSCHUH, District Judge, concurring in part and dissenting in part.

The majority opinion expressly holds, correctly in my view, that in the present case "the existence of a warranty is a question of fact."[1] Implicit in that holding is a recognition that the application of U.C.C. § 2–316(3)(a), concerning the effect to be given the expression "as is," involves a question of fact in determining whether in a particular case the usual statutory effect is not to be applied because "the circumstances indicate otherwise." On this first basic issue of the existence and scope of the warranty, the majority opinion defers to the findings of the district court. On the second basic issue of whether the buyer gave notice of a breach of that warranty to the seller within "a reasonable time" after discovery of the breach, as required by U.C.C. § 2–607(3)(a), the majority opinion abandons its deference to the district court's findings. The majority opinion holds that "the issue of notice in this case presents a mixed question of fact and law," freeing the appellate court of the restrictions of Fed.R.Civ.P. 52(a) and permitting this court to reach a contrary conclusion as to the adequacy and timeliness of any notice. Although the district court found that "adequate and timely" notice had been given, the majority opinion reaches the opposite conclusion and finds that the buyer's conduct "did not constitute timely or adequate notification that the transaction was claimed to involve a breach." If the appellate court were completely free to arrive at this determination *de novo*, I would agree

that the conclusion of the majority members of this panel is one which could be reasonably reached from the evidence in the record presented to us. Because I believe, however, that deference must be given to the district court's determination of this issue, as well as to the district court's determination of the issue concerning the existence and scope of the warranty, I respectfully dissent.

I.

A.

The majority opinion holds that the question of whether any type of notice was given, and if so, what that notice consisted of and when it was given, is one of fact, but that the question of whether the notice satisfied the statutory requirement of U.C.C. § 2–607(3)(a) is one of law. "Thus the issue of notice in this case presents a mixed question of fact and law. In reviewing mixed findings we are not bound by the clearly erroneous standard."

Although the district court clearly regarded the issue of "adequate and timely notice" as being entirely a factual issue, I recognize that any "label" given by the trial court to a determination made by that court is of no importance, *Utzinger v. United States*, 432 F.2d 485 (6th Cir. 1970), and that the conclusiveness of any "finding of fact" by the lower court must depend on the nature of the materials on which the finding is based. This court should obviously decide itself whether the trial court's determination is purely a factual one based solely on the evidence, whether it is purely a legal conclusion, or whether it is the "mixed question" involving the application of some legal standard to preliminary factual findings. In the present case, there can be no question but that the trial court's evidentiary findings on the "subsidiary facts" of the existence of any type of no-

---

1. *Cf. Price Brothers Co. v. Philadelphia Gear Corp.*, 649 F.2d 416 (6th Cir. 1981). In that case the question of whether a seller's representations in a journal article and sales literature or the assurances of a sales representative were a part of the parties' bargain for the purpose of determining the existence of any express warranty was deemed to be a finding of fact which would not be set aside unless clearly erroneous.

tice, the content of that notice and the time when the notice was given are all governed by the "clearly erroneous" restriction on appellate review imposed by Rule 52(a). It is when, as here, the district court then makes a determination of a so-called "ultimate fact"—that the notice as given was both "adequate and timely" in compliance with an applicable legal standard (in this case the statutory requirement of U.C.C. § 2–607(3)(a))—that the question arises as to how this determination should be classified for the purpose of review by the appellate court.[2]

It has been noted that "both federal and state cases clash hopelessly in classifying law application by a trial judge as a factual or legal matter."[3] The classification is not always easy to make,[4] and the distinction in the cases is not always readily apparent. Whether a person was an "employee" under a collective bargaining agreement has been held to be a conclusion of law, *Taft Broadcasting Co. v. Columbus-Dayton Local of the American Federation of Television and Radio Artists*, 297 F.2d 149 (6th Cir. 1961), but whether a person was an "employee" of a nonappropriated fund instrumentality of

the United States under a statute dealing with such employees has been held to be an issue of fact governed by Rule 52(a). *Johnson v. United States*, 600 F.2d 1218 (6th Cir. 1979). Whether defendant's usage of certain words on its products constituted use as a trademark within the meaning of the Trade-Mark Act of 1946 has been held to be "either a mixed finding of fact and conclusion of law, or it is a finding of an ultimate fact in the making of which is involved legal principles" to which Rule 52(a) had no application, *Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.*, 477 F.2d 150, 154 (6th Cir. 1973), but whether particular conduct constituted an unreasonable restraint of trade under the Sherman Act has been held to be a question of fact and governed by Rule 52(a). *Bale v. Glasgow Tobacco Bd. of Trade*, 339 F.2d 281 (6th Cir. 1964).

In the present case, it could be argued that the district court's finding that proper notice was given should be characterized as a "finding of fact" to which Rule 52(a) applies. After all, in *Standard Alliance Industries v. Black Clawson Co.*, 587 F.2d 813,

**2.** While "[f]inding so-called ultimate 'facts' more clearly implies the application of standards of law," *Baumgartner v. United States*, 322 U.S. 665, 671, 64 S.Ct. 1240, 1243, 88 L.Ed. 1525 (1943), it cannot be said that whenever an issue requires the application of standards of law it is automatically no longer a "factual" issue controlled on appeal by Rule 52(a). For example, a finding of negligence or the absence thereof, *Downs v. United States*, 522 F.2d 990 (6th Cir. 1975) and *Gowdy v. United States*, 412 F.2d 525 (6th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); a finding of proximate cause or the absence thereof, *Michael v. United States*, 338 F.2d 219 (6th Cir. 1964); and, more akin to the issue of a timely and adequate notice, a finding of laches, *American Home Products Corp. v. Lockwood Mfg. Co.*, 483 F.2d 1120 (6th Cir. 1973), would all appear to involve the application of legal principles to subsidiary facts. This court, however, has held that these issues are "fact" issues and are governed by the "clearly erroneous" limitation on appellate review set forth in Rule 52(a).

**3.** Weiner, *The Civil Nonjury Trial and the Law-Fact Distinction*, 55 Cal.L.Rev. 1020, 1022 (1967). "[A]lthough it is clear enough that the 'clearly erroneous' rule has no application to questions of pure law, the line is very hazy and the decisions inconsistent ... when there are

mixed questions involving the application of law to facts." 9 Wright & Miller, Federal Practice & Procedure 752 (1971).

**4.** This is evident by the frequency with which alternative classifications are considered. A particular finding is viewed by the court as being either a finding of fact *or* a conclusion of law, *Taft Broadcasting Co. v. Columbus-Dayton Local of the American Federation of Television & Radio Artists*, 297 F.2d 149 (6th Cir. 1961); as a conclusion of law *or* as a mixed finding of law and fact *or* as a finding of an ultimate fact, *Ashland Oil & Refining Co. v. Kenny Construction Co.*, 395 F.2d 683 (6th Cir. 1968); as either a mixed finding of fact and conclusion of law *or* as a finding of the ultimate fact in the making of which is involved legal principles, *United States v. Weingarden*, 473 F.2d 454 (6th Cir. 1973) and *Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.*, 477 F.2d 150 (6th Cir. 1973). This court very recently observed that in patent litigation, "separating matters of fact from matters of law for purposes of appellate review is about as easy as unscrambling eggs." *General Motors Corp. v. Toyota Motor Co., Ltd.*, 667 F.2d 504 at 505 (6th Cir. 1981).

823 (6th Cir. 1978), relied upon in the majority opinion, this court, construing U.C.C. § 2–607(3)(a), specifically held:

> Whether proper notice was given is a question of fact. *Eastern Air Lines v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 (5th Cir. 1976); *Lynx Inc. v. Ordinance Products, Inc.*, 273 Md. 1, 327 A.2d 502, 512 (1974); *L. A. Green Seed Co. of Arkansas v. Williams*, 246 Ark. 463, 438 S.W.2d 717, 720 (1969). *See E. C. Ernst v. General Motors Corp.*, 537 F.2d 105, 108 (5th Cir. 1976) (applying contract notice provision); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 298 (3d Cir. 1961) (applying Uniform Sales Act); *Columbia Axle Co. v. American Automobile Ins. Co.*, 63 F.2d 206, 208 (6th Cir. 1933) (applying Uniform Sales Act). *See also* 2 Anderson on the Uniform Commercial Code § 2–607:24 (1970).

Although I believe that this court, therefore, could easily have held that the district court's finding that proper notice was given is a "question of fact" for the purpose of applying the Rule 52(a) standard of review, I nevertheless agree with the majority opinion that such a finding by a trial judge does involve the application of a legal standard—the statutory requirements of U.C.C. § 2–607(3)(a)—and therefore could be considered in a broad sense as being a "mixed question of fact and law." The question is then narrowed to a determination of the proper standard of review to be applied to this "mixed question of fact and law."

### B.

In the final analysis, the labeling of findings, whether by the trial court or by the appellate court, is not, in my view, of any great importance. However labeled, if a determination by the trial court necessarily requires the application of a legal standard to subsidiary facts found by the trial court, then that determination is not "binding on the appellate court"[5] in the sense that the review is limited to the clearly erroneous standard of Rule 52(a). When considering the interpretation and application of legal standards—whether principles of case law or statutes or rules—the appellate court is completely unrestrained in its review of whether the correct legal standards were applied by the trial court. If the lower court misinterpreted an applicable statute, *e.g., Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co., supra,* then clearly Rule 52(a) has no application. "Where mixed questions of law and fact are presented *and there is error as to the law,* we may reverse the District Court free of the clearly erroneous rule." *Acme Highway Products Corp. v. D. S. Brown*, 473 F.2d 849, 854 (6th Cir.), *cert. denied*, 414 U.S. 824, 94 S.Ct. 125, 38 L.Ed.2d 57 (1973) (emphasis added).[6] If, however, there is no claim made that the trial court applied an incorrect legal standard or if, upon review of such a claim this court determines that the correct legal standard *was* applied, the question then becomes one of what weight, if any, should be given to the finding of the trial court resulting from the application of that legal standard. The fact that such a finding clearly involves application of law to facts found by the trial court—a "mixed question of law and fact"—should not automatically free the appellate court to make its own independent evaluation of the evidence and to substitute its own judgment for that of the district court.[7] It is certain-

---

**5.** *Cordovan Associates, Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 859 (6th Cir. 1961).

**6.** *See also Senter v. General Motors Corp.*, 532 F.2d 511, 526 (6th Cir. 1976) ("[W]e are not so bound [by Rule 52(a)] where the contention is that the district court applied erroneous legal principles."); *Nash v. Farmers New World Life Ins. Co.*, 570 F.2d 558, 561 n.7 (6th Cir. 1978) ("Of course, the clearly erroneous standard would not apply if we were reviewing a claim that the District Court relied on an improper

legal definition of materiality in reaching its findings.").

**7.** *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975), cited in the majority opinion, is representative of a line of cases involving constitutional rights which are deemed to be beyond the restrictions normally imposed on appellate review. In such cases, federal appellate courts have a duty to apply the applicable rules of constitutional law upon the basis of an independent review of the facts of each case. *Jacobellis v. Ohio*, 378 U.S. 184, 189, 84 S.Ct. 1676,

ly not unusual for judges to agree upon an applicable legal standard but to sharply disagree in the application of that legal standard to a given set of facts. If a district court judge applies a correct legal standard and his conclusion is supported by substantial evidence in the record and is not unreasonable, then the decision, in my opinion, should be affirmed, even though a panel of appellate court judges would have rendered a different decision based on the record presented to the appellate court.

The rationale for the "clearly erroneous" test in reviewing "findings of fact" has recently been set forth by this court in *United States v. Jabara*, 644 F.2d 574, 577 (6th Cir. 1981):

> The "clearly erroneous" test does not derive solely from the trial judge's superior opportunity to assess the credibility of witnesses; it also reflects and preserves the proper relationship between trial courts and courts of appeal. See *Lundgren v. Freeman*, 307 F.2d 104 (9th Cir. 1962).[8]

Giving deference to a district court's determination that involves the application of a correct legal standard and is supported by substantial evidence likewise recognizes that the trial court is in a better position to reach evidentiary findings based upon the entire record presented to that court and is in at least an equal position to apply a

correct legal standard to those findings. Such recognition "reflects and preserves the proper relationship between trial courts and courts of appeal." *United States v. Jabara, supra*, at 577. In *Ashland Oil & Refining Co. v. Kenny Construction Co.*, 395 F.2d 683 (6th Cir. 1968), a standard of review of a "mixed finding" that gives such deference to the lower court's conclusion was clearly indicated.

The District Court's determination that plaintiff "failed to sustain the burden of showing that defendant's blasting operations damaged plaintiff's equipment or caused said leaking of the generators," while labeled a conclusion of law, may more accurately be regarded as a mixed finding of law and fact or as a finding of an ultimate fact. If regarded as a finding of fact (See *McAllister v. United States*, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.*, 298 F.2d 356 (6th Cir. 1961)) we cannot say that it is clearly erroneous. Rule 52, F.R.Civ.P. If regarded as a mixed finding, the application of legal principles was involved in making the determination, and it is therefore subject to review free from the clearly erroneous rule. See *Taft Broadcasting Co. v. Columbus-Dayton Local*, 297 F.2d 149 (6th Cir. 1961); *Cordovan Associates, Inc. v. Dayton Rubber Co.*, 290

---

1678, 12 L.Ed.2d 793 (1963). As this court stated in *Guzick v. Drebus*, 431 F.2d 594, 599 (6th Cir. 1970):

> We believe that the Supreme Court has commanded that, when dealing with questions of constitutional magnitude, we are not at liberty to accept the fact trier's findings merely because we consider them not "clearly erroneous" as that term is employed in Rule 52(a) F.R.Civ.P. We must make our own examination of the material from which decision is made. *Feiner v. New York*, 340 U.S. 315, 322–325, 71 S.Ct. 303, 307–309, 95 L.Ed. 295 (1951) (Black, dissenting); *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963); *Jacobellis v. Ohio*, 378 U.S. 184, 189, 84 S.Ct. 1676, 1678, 12 L.Ed.2d 793 (1964).

There are, of course, no constitutional issues involved in the present case.

8. The established deference to a district court's findings of fact extends, at least in this Circuit, to findings based on undisputed facts or on a

record consisting entirely of documentary evidence with credibility of witnesses not being a factor. *United States v. Allinger*, 275 F.2d 421 (6th Cir. 1960); *United States Steel Corporation v. Fuhrman*, 407 F.2d 1143 (6th Cir. 1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970); *H. K. Porter Co. v. Goodyear Tire & Rubber Co.*, 437 F.2d 244 (6th Cir.), *cert. denied*, 404 U.S. 885, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971); *Ingram Corp. v. Ohio River Co.*, 505 F.2d 1364 (6th Cir. 1974); *Schnadig v. Gaines Mfg. Co.*, 494 F.2d 383 (6th Cir. 1974); *Ray v. Rose*, 535 F.2d 966, 973 (6th Cir. 1976); *Eliason v. National Sanitation Foundation*, 614 F.2d 126 (6th Cir. 1980); *Gartrell v. United States*, 619 F.2d 1150 (6th Cir. 1980); *United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981). *But see Lydle v. United States*, 635 F.2d 763, n. 1, (6th Cir. 1981), "Where the trier of fact has observed no witnesses, the 'clearly erroneous' test is inapplicable."

F.2d 858 (6th Cir. 1961). Plaintiff does not contend, nor do we find, that the District Court applied an incorrect principle of law to the facts, and *while that court's determination is not the only one permissible under the facts, it is supported by substantial evidence and is not unreasonable.* Accordingly, the judgment of the District Court should be affirmed.

*Id.* at 684 (emphasis added).

Applying this standard of review,[9] the issues on appeal in the present case are twofold. Did the district court apply the correct legal standard in this case, *i.e.,* did the district court correctly interpret the applicable statute, and if it did, is the district court's ultimate finding as a result of that application supported by substantial evidence and not unreasonable? If the answers to both questions are in the affirmative, then this court should let the finding stand, even though, if free to do so, this court would have reached a different conclusion had it been the finder of fact in this case.

### II.

### A.

There is no disagreement among the members of this panel as to the correct interpretation of U.C.C. § 2–607(3)(a). Certainly for merchant buyers, the notification requirement of the statute requires more than simply indicating that the transaction is troublesome. *Standard Alliance Industries, Inc. v. Black Clawson Co.,* 587 F.2d 813 (6th Cir. 1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957 (5th Cir. 1976); *T. J. Stevenson & Co., Inc. v. 81,193 Bags of Flour,* 629 F.2d 338 (5th Cir. 1980). But, beyond that, there is no requirement that the notice of breach be of any specific type or employ any specific language. It may be an oral notice; it may be given in a single communication or derived from several; and it need not be a specific claim for damages or an assertion of legal rights.[10] The adequacy and timeliness of notice under U.C.C. § 2–607(3)(a) typically depend upon the reasonableness of the buyer's efforts to communicate his dissatisfaction, *Eastern Air Lines, supra,* at 973, and the question of reasonableness must be determined from the circumstances in the individual case. *Pritchard v. Liggett & Myers Tobacco Company,* 295 F.2d 292 (3rd Cir. 1961) (applying Uniform Sales Act). The nature of this determination, incidentally, is why the notice issue, in my view, is a question particularly within the province of the fact finder.

### B.

The majority opinion states that the district court "erred in accepting the statement from Comment 4 '[t]he content of the

---

9. *Cf. Sweeney v. Bd. of Trustees of Keene State College,* 604 F.2d 106, 109, n. 2 (1st Cir. 1979):

   This circuit has applied the clearly erroneous standard to conclusions involving mixed questions of law and fact except where there is some indication that the court misconceived the legal standards. *E.g., Burgess v. M/V Tamano,* 564 F.2d 964, 976–977 (1st Cir. 1977), *cert. denied,* 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978) (admiralty negligence); *Raymond v. Eli Lilly & Co.,* 556 F.2d 628, 629–30 (1st Cir. 1977) (finding of reasonable diligence) (per curiam); *Forbro Design Corp. v. Raytheon Co.,* 532 F.2d 758, 763 (1st Cir. 1976) (finding of "obviousness"); *cf. Senter v. General Motors Corp.,* 532 F.2d 511, 526 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976) (court not bound by "clearly erroneous" principle where party contends wrong legal principle applied).

   Although there is a difference between a standard of review based upon the clearly erroneous rule and one based only upon "substantial evidence," *Jackson v. Hartford Accident and Indemnity Co.,* 422 F.2d 1272, 1275 (8th Cir. 1970) (Lay, C. J., concurring), there would appear to be no significant difference between evaluating a trial court's "mixed question of law and fact" determination, assuming the application of a correct legal standard, as being not clearly erroneous, *Sweeney v. Bd. of Trustees of Keene State College, supra,* and as being supported by substantial evidence and not unreasonable, *Ashland Oil & Refining Co. v. Kenny Construction Co., supra.*

10. *T. J. Stevenson & Co., Inc. v. 81,193 Bags of Flour,* 629 F.2d 338, 359 (5th Cir. 1980).

notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched [ ]' as controlling." I do not find anything in the district court's opinion to indicate that the trial judge accepted this single statement from the Comment as controlling. The district court, while relying on the Comment, emphasized not only the portion quoted in the majority opinion but also the sections of the Comment describing the purpose of the rule and the type of notice which is deemed sufficient, *i.e.*, "such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." More importantly, the district court was well aware of this court's decision in *Black Clawson* and of the Fifth Circuit's decision in *Eastern Air Lines*, citing and discussing both of those cases in its opinion. While the district court pointed out that "Calweld certainly had notice that 'the transaction (was) ... troublesome and must be watched'" the district court also made the important finding that "Moreover, Edward Kossouf specifically notified Calweld that K & M intended to hold it responsible for the losses incurred because the Calweld-12 was inexplicably 'falling apart.'" The district court correctly discussed the purposes of the notice requirement as set forth in *Black Clawson*. With those purposes in mind, the district court found that notice was given and found that K & M's subsequent conduct, unlike that of the buyer in *Eastern Air Lines*, "did not dissipate the effect of its notice." The district court finally conclud-

ed that "K & M's conduct 'taken as a whole' constitutes adequate notice of breach." There is nothing in the district court's decision that indicates that the trial judge failed to understand the teachings of *Black Clawson* and *Eastern Air Lines* or that he failed to apply the correct legal standard of the statute as construed in those cases.[11]

### C.

If, as I believe, the district court understood and applied the correct interpretation of the statute to the facts, the remaining question is whether that court's ultimate finding that adequate and timely notice had been given is "supported by substantial evidence and is not unreasonable." *Ashland Oil & Refining Co. v. Kenny Construction Co., supra.* I believe that it is, although the district court's ultimate finding is clearly "not the only one permissible under the facts," *id.* at 684, and not the one which I would necessarily make if I were reaching a conclusion based upon a *de novo* review of the evidence in the record before us.

The present case is clearly distinguishable from *Black Clawson* in which this court reversed, on the notice issue, a judgment entered pursuant to a jury's verdict in favor of the buyer. In that case, one of the buyer's claims was that the seller had breached an express warranty to repair or replace defective parts. There was absolutely no notice of any kind, however, that the buyer considered the seller to be in breach of this warranty, "[i]ncredible as it may seem." *Black Clawson, supra*, at 825.

---

11. The district court, quoting from this court's opinion in *Black Clawson*, recognized that notice of the breach serves two distinct purposes: "First, express notice opens the way for settlement through negotiation between the parties. Second, proper notice minimizes the possibility of prejudice to the seller by giving him 'ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties.'"

In *T. J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338 (5th Cir. 1980), the Fifth Circuit also considered the initial question of whether the district court had applied the correct legal standard of U.C.C. § 2–607(3)(a):

Applying these concepts to the instant case, we first observe that while the District Judge did not make elaborate findings concerning notice, he did treat it as a fact question and recognized that *Eastern Air Lines* requires more than minimal notice:

A purpose of section 2–607 notice requirement is to inform the seller that his tender is non-conforming, *but also to open the way for settlement* through negotiations between the parties.

*Id.* at 361–362 (emphasis is that of the appellate court).

This was held to be sufficient to show an "appreciation for the appropriate legal standard." *Id.* at 362.

Unlike *Black Clawson*, the record in the present case does contain evidence which would support a finding that adequate notice was given that the buyer considered the seller in breach. Within thirty days after the TBM had been first positioned in the tunnel on June 25, 1974, and after repeated problems with the machine during this period, Calweld dispatched one of its service representatives to the job site after complaints by K & M to Calweld that "your machine is falling apart."[12] While at the job site, Edward Kassouf, representing K & M, told Calweld's service representative, "You got problems, and we got problems, because there's no reason this machine should fall apart."[13] The service representative prepared a written report which he sent to the attention of Calweld's Vice President of Engineering in which the service representative "indicated ... that Ed Kassouf had wanted someone from Calweld to see the problem before any repairs were made, because he was going to charge it back to Calweld...."[14]

As Official Comment 4 makes clear, the notice required by U.C.C. § 2–607(3)(a) may be of a general nature as long as it is sufficient to inform the seller that the transaction is claimed to involve a breach; it is not necessary that all of the objections be set forth; it is not necessary that it contain any claim for damages; it is not necessary that it contain any threat of litigation or other resort to a remedy. In view of this, there certainly is substantial evidence in the record to support the district court's finding that "K & M's conduct 'taken as a whole' constituted adequate notice of breach," and in light of the evidence presented such a finding is not unreasonable.

The question remains whether the conduct of K & M, particularly subsequent to Kassouf's July, 1974 statement, dissipated the effect of his statement that he intended "to hold Calweld responsible for these problems." The majority opinion, with regard to the evidence concerning this notice, states "if K & M had followed through on Kassouf's July, 1974 statement to the Calweld service representative by billing Calweld for the cost of repairs to that date or by claiming the right to offset its expenses against Calweld's charges for repair and replacement parts, there might be some basis for holding that Calweld was notified of the nature of K & M's claim." Relying on the *Eastern Air Lines* decision, the majority concludes that K & M's conduct in continuing to order repair and replacement parts from Calweld and to pay for those parts as billed without protest throughout the period when problems were being experienced was "inconsistent with the claim that K & M considered Calweld liable." Although the record could reasonably be so construed, the trial court, which had the opportunity of evaluating all of the evidence as it was presented, did not construe the record in this way. Instead, the district court found that "K & M's conduct did not dissipate the effect of its notice."

The *Eastern Air Lines* decision, relied upon by the majority, neither compels nor warrants setting aside the lower court's judgment. Initially, it should be noted that the *Eastern Air Lines* case came before the Fifth Circuit Court of Appeals in a different procedural posture than the instant case. In *Eastern Air Lines* the district court had ruled as a matter of law in a jury case that the buyer had adequately notified the seller of a breach and did not submit the notice issue to the jury. The appellate court held that "whether the notice requirement has been complied with is a question which is particularly within the province of the jury," *id.* at 973, and that the issue of notice under U.C.C. § 2–607(3)(a) should have been submitted to the jury as the fact finder with instructions that it determine whether the buyer's conduct constituted adequate and timely notice to the seller that it was considered to be in breach of the contracts. In a subsequent case involving, as does this appeal, a trial to the court and a

**12.** Joint Appendix at 148.

**13.** Joint Appendix at 149.

**14.** Joint Appendix at 595.

finding by the trial court that the notice given was adequate and timely, the Fifth Circuit upheld the trial court's findings and distinguished its *Eastern Air Lines* decision, observing that, "In the instant case, there is a factfinding, not a directed verdict, of adequate notice based on all the evidence." *T. J. Stevenson & Co., Inc., supra*, at 364.

In addition, the *Eastern Air Lines* case is not factually comparable to the present case. In *Eastern Air Lines* the purported notice to the seller simply expressed the buyer's view that some of the delays in deliveries of aircraft should have been avoided and merely requested the seller's help in mitigating the delay's impact on the buyer's operations. The buyer, through various public announcements, also appeared to accept the seller's excuse for the delays, an excuse which would have absolved the seller of liability. Under those circumstances, the buyer "may well have led [the seller] to believe that it was not in breach of the agreements." *Eastern Air Lines, supra*, at 978. The buyer also entered into new contracts with the seller which "may very well have led [the seller] to believe that, even though [the buyer] was unhappy about the delays, it did not consider them to be a breach of the contract." *Id.* at 979. Finally, there was also evidence, although disputed, that the buyer had assured the seller that no damages would be sought because of the delivery delays.

Unlike the buyer's ambiguous communication in *Eastern Air Lines*, Kassouf's statement to Calweld's service representative of an intention "to hold Calweld responsible for these problems" is an unequivocal assertion of claimed responsibility sufficient to inform Calweld "that the transaction is claimed to involve a breach." Furthermore, the buyer in the present case was confronted with the necessity of completing contracts with the Cleveland Regional Sewer District for the construction of a sewer line, using a thirty ton mining machine operating in a tunnel some seventy feet underground. As the cutting wheel advanced slowly into the rock face ahead, the machine was followed by sewer pipe installation, and operations frequently had to stop while needed repairs were necessarily made inside the tunnel. After approximately six months, the troubled machine reached the Berea Road shaft where it was removed from the tunnel, disassembled and virtually rebuilt by K & M. The district court described the machine as "the single most important piece of equipment K & M would use" to perform the contracts, and pointed out that a replacement "would not be readily available because TBM's are not normally carried in inventory." Under the particular circumstances of this case, K & M's constant efforts to repair the highly sophisticated and unique machine while attempting to meet its contractual deadlines and K & M's reliance on Calweld for parts and technical assistance in making those essential repairs must be taken into consideration in evaluating Calweld's conduct subsequent to its notice.

As the Fifth Circuit pointed out in *Eastern Air Lines*, "the buyer's good faith is the governing criterion under section 2–607," *id.* at 977, and in some cases actions by a buyer subsequent to giving notice may dissipate the effect of that notice. Wrongfully leading the seller to believe that, in spite of the notice, the buyer did not consider the seller to be in breach of a contract is not indicative of the commercial good faith which, as the majority opinion notes, is "the underpinning of U.C.C. § 2–607." I have no disagreement with that proposition, one which indeed emphasizes, in my view, the inherently factual nature of any inquiry into the adequacy and timeliness of a notice under the statute in the light of the parties' conduct and all of the circumstances of a particular case. In *T. J. Stevenson & Co., Inc., supra*, at 361, the Fifth Circuit analyzed its prior decision in *Eastern Air Lines* and said:

> *Eastern Air Lines* therefore teaches two concepts. First, the factfinder's determination of the mixed law-fact issue of notice, if based on a correct understanding of the law, is to be given great weight. Second, § 2–607(3)(a) notice must be evaluated from the perspective of the policies which it seeks to encour-

age: compromise by the parties; and conduct within the bounds of commercial good faith.

In the present case, following a lengthy trial involving numerous witnesses and many exhibits, the district court found, upon consideration of all the evidence, that "Calweld had ample opportunity to investigate and settle the claim or take other measures to defend itself and minimize the damages." The district court also recognized that "Good faith between merchants is defined in § 2–103(1)(b) as '*honesty in fact* and the observance of reasonable standards of *fair dealing* in the trade'" (emphasis is that of the district court) and held that "K & M's conduct met this standard."

This appellate court in *Mader v. Armel*, 461 F.2d 1123 (6th Cir.), *cert. denied*, 409 U.S. 1023, 93 S.Ct. 465, 34 L.Ed.2d 315 (1972), applied the "clearly erroneous" standard of review to a trial court's determination of whether a person "acted in good faith." While different inferences might well be drawn from the evidence in this case, I certainly cannot say that the district court's finding concerning K & M's good faith is clearly erroneous. I would not, therefore, overturn the trial court's determination that "K & M's conduct did not dissipate the effect of its notice."

Finally, it is unnecessary to determine whether the district court's finding that Calweld was a "merchant" and K & M was not a "merchant" is clearly erroneous. Although the district court judge discussed this question in his opinion, he explicitly stated, "However, even assuming K & M is a merchant, its notice was adequate and timely." It is apparent from the opinion and the district court's discussion of *Eastern Air Lines'* requirement of good faith, the reference to the definition of good faith between merchants, and the finding that K & M met the standard of good faith be-

tween merchants, that the district court applied the requirement of notice that is applicable to merchants in such cases.

## CONCLUSION

It is with great reluctance that I dissent in this case. The majority opinion is a thorough and carefully considered analysis of the record in this case by two distinguished appellate court judges. I cannot escape the conviction, however, that with respect to the notice issue the established deference accorded the fact finder has not been applied. "[T]he factfinder's determination of the mixed law-fact issue of notice, if based on a correct understanding of the law, is to be given great weight." *T. J. Stevenson & Co., Inc., supra*, at 361. If the district court's finding is considered as a "finding of fact" and reviewable under the clearly erroneous standard of Rule 52(a), I am not left with "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947).[15] If it is considered as a "mixed finding of law and fact," the district court's finding is supported by "substantial evidence and is not unreasonable," *Ashland Oil & Refining Co. v. Kenny Construction Co., supra*, at 364, although it is certainly not the only permissible conclusion which could have been reached nor the one which I necessarily would have reached had I been the factfinder in this case.

15. The language of this court in *Strickler v. Pfister Associated Growers*, 319 F.2d 788, 790 (6th Cir. 1963) is equally applicable to the case *sub judice*.

It is not enough that we might give the facts another construction, resolve the ambiguities differently, and reach a conclusion different

from that of the District Judge. Such a conclusion on our part does not make the finding "clearly erroneous." *United States v. National Association of Real Estate Boards*, 339 U.S. 485, 495–496, 70 S.Ct. 711, 717–718, 94 L.Ed. 1007.