LAMBORN & CO. *v.* GREEN & GREEN.*

(*Nashville.*   December Term, 1923.)

1. CONTRACTS. Party permitting time for performance to pass must give notice granting reasonable time for performance thereafter.

Where parties to contract concur in permitting time fixed for performance to pass without performance, time of performance becomes indefinite, and one cannot put other in default except on notice giving reasonable time for performance. (*Post, pp.* 44, 45.)

Cases cited and approved: Wildberg Box Co. v. Darby, 143 Tenn., 81; Tennessee Fertilizer Co. v. International Agr. Corporation, 146 Tenn., 451; Vosburg v. So. Lbr. & Mfg. Co., 147 Tenn., 647.

2. SALES. Seller's demand for performance held given reasonable time before resale.

Seller's demand, mailed in time to reach buyers week before resale on falling market, for assortments and shipping instructions as to remainder of sugar due under contracts "without further delay," *held* reasonable, and resale not too expeditious, especially as resale price would not have been binding on buyers if sale had been delayed. (*Post, pp.* 45-47.)

Case cited and approved: McKay Carriage Co. v. So. Lbr. & Mfg. Co., 259 S. W., 1076.

3. SALES. When demand by seller for performance not required stated.

Where one party unequivocally refuses to go on with contract, as by expressing intention not to order any more goods contracted for until claim for damages on account of other goods is adjusted, other party need not demand performance. (*Post, pp.* 47, 48.)

Case cited and approved: Fleming Co. v. Edmonds, 147 Tenn., 632.

4. SALES. Misrepresentation of quality of sugar sold held not shown by preponderance of testimony.

Lamborn & Co. v. Green & Green.

In seller's suit for difference between contract price of sugar and market price on resale after buyer's default, cross-bill alleging misrepresentations, of quality of other sugar sold to defendants *held* properly dismissed as not sustained by preponderance of testimony. (*Post, pp.* 48, 49.)

5. **CONTRACTS.** Restoration of consideration ordinarily condition of rescission.

In action of rescission, restoration of consideration will be decreed as condition to relief sought, save in exceptional cases. (*Post. pp.* 49-51.)

6 **SALES.** Buyers using sugar in their business held not entitled to rescind contract for unfitness.

Buyers electing to rescind contract on ground that sugar delivered was unfit for use in their business, but using most of it in manufacturing their products, *held* not entitled to rescission, because not in position to return consideration; Uniform Sales Act, section 69, sub-sec. 5, authorizing buyer electing to rescind, on seller's refusal to accept return of goods, to hold lien thereon, not justifying retention of goods by buyers. (*Post, pp.* 49-51.)

Acts cited and construed: Acts 1919, ch. 118.

Case cited and approved: Hawkins v. Byrn, 261 S. W., 980.

7. **SALES.** Buyers' election to rescind held to preclude recovery for breach of warranty.

Buyers electing to rescind contract *held* bound by election, and not entitled to recover damages for breach of warranty. (*Post, p.* 51.)

Case cited and approved: Montlake Coal Co. v. Chattanooga Co., 137 Tenn., 440.

8. **SALES.** Buyers cannot recover damages for breach of warranty of quality without proof of actual value.

In absence of proof of actual value of sugar purchased, buyers could not recover damages for breach of warranty of quality in amount of difference between actual value and value had quality been as

represented, under Acts 1919, chapter 118, section 69, subsec. 7. (*Post, p.* 51.)

Case cited and approved: Shwab v. Walters, 147 Tenn., 638.

9. **SALES.** Buyers using sugar after informing sellers that attempt would be disastrous cannot recover enhanced damages from so doing.

Buyers using sugar purchased in manufacturing their goods after promptly informing sellers that such attempt would be disastrous cannot recover enhanced damages sustained by reason of experiments. (*Post, pp.* 51, 52.)

---

*Headnotes 1. 13 C. J., Contracts, section 784; 2. 35 Cyc, Sales, p. 523 (1925 Anno); 3. 35 Cyc, Sales, p. 171; 4. 35 Cyc, Sales, p. 83; 5. 13 C. J., Contracts, section 679; 6. 35 Cyc, Sales, p. 142; 7. 35 Cyc. Sales, p. 445 (1925 Anno); 8. 35 Cyc, Sales, p. 465; 9. 35 Cyc, Sales, p. 474.

---

### FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County.— HON. JAS. B. NEWMAN, Chancellor.

J. B. SIZER, SIZER, CHAMBLISS & JOHNSON, MANIER & CROUCH and HITCH, DENMARK & LOVETT, for Lamborn & Co.

R. B. C. HOWELL, for Green & Green.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

The complainants, Lamborn & Co., are sugar brokers and dealers with offices in New York and Savannah. The defendants, Green & Green, are manufacturers of a soft drink known as Muscadine Punch, having a manufacturing plant at Nashville, and using large quantities of sugar in their business.

Lamborn & Co. v. Green & Green.

On April 30, 1920, the defendants bought from complainants 235 barrels of sugar. On May 7, 1920, the defendants bought from complainants 525 barrels of sugar. These transactions were both evidenced by written contracts. Deliveries under both contracts were to be spread over a period beginning the latter part of July, 1920, and ending October 1, 1920. The price of the sugar under both contracts was 25.50 cents per pound, and the quality was standard fine granulated.

The defendants ordered out and paid for 379 barrels of sugar under the two contracts, leaving a balance due them of 381 barrels which they declined to take. The complainants sold the 381 barrels refused by the defendants on the market, and filed this bill to recover the difference between the price which the said sugar brought and the contract price thereof, amounting to $22,255.07,

The defendants answered the bill, making certain charges of fraud against the complainants in the negotiation of these contracts. These charges, however, were not pressed on the hearing and are not sustained by the proof. Defendants denied liability generally, and, filing their answer as a cross-bill, sought a recovery from the complainants by reason of alleged misconduct of the latter with reference to a third sugar contract. On May 5, 1920, complainants sold the defendants 50 tons of an imported sugar known as Mauritius crystals for $24,358.86. There was a written contract witnessing this sale, and under the terms thereof payment for this sugar was required in New York upon the delivery of the sugar on the cars in that city. So defendants had paid for this sugar before it arrived in Nashville July 10, 1920. The defendants claimed that the Mauritius crystals sugar was worthless for their use, charged the complainants with the breach of an ex-

press and an implied warranty in the sale thereof, and claimed damages against the complainants for an amount exceeding the cost of said sugar.

The cross-bill was answered and its material averments denied by the complainants.

Proof was taken, and upon the hearing before the chancellor, he dismissed both the bill and the cross-bill, and divided the costs for reasons to which we shall hereafter refer. Both parties have appealed, and the case has been elaborately briefed and argued in this court.

Considering first the assignments of error of the complainants, which challenge the action of the chancellor in dismissing their bill, we find ourselves unable to concur in the result reached.

Shortly after the consummation of the two contracts first above referred to for the standard fine granulated sugar, the price of sugar began to drop. The defendants wrote the complainants a letter, and asked to be relieved of part of their purchases, to which request the complainants refused to agree. The defendants then ordered out a portion of the sugar for shipment in July, and later ordered out another portion for shipment in August. These orders took up, as before stated, 379 of the 760 barrels involved in the two contracts for standard fine granulated. These two contracts provided:

"Sellers to furnish sugars packed in barrels or bags, but sellers have option of shipping no more than 50% of contract in 100-lb. bags. . . . Assortments against contract must be furnished when called for by sellers."

On August 11, 1920, the defendants wired the complainants at Savannoh not to make further shipments under the contracts for standard fine granulated sugar. On the same day the defendants wired complainants at New York

that they (defendants) were holding the Mauritius crystals sugar subject to complainants' order, and that the sugar would be disposed of on complainants' account unless defendants were otherwise instructed. The message concluded that pending the adjustment of this matter the defendants would refuse to order any further shipments under the contracts for standard fine granulated. Defendants followed these telegrams with letters to the same effect.

The complainants replied to the telegrams just mentioned and the letters and took the position that they were brokers only, for a disclosed principal, in the sale of the Mauritius crystals, as disclosed by the written contract, and were not, therefore, responsible for any defects in this sugar. Complainants agreed, however, to negotiate with their principal and see if they could make an adjustment of defendants' claims. Complainants insisted that the Mauritius crystals sugar was sold without any warranty or representation as to quality by them, and further insisted that the contract was entirely distinct from those contracts by which the defendants had agreed to purchase the standard fine granulated sugar. While the complainants insisted that defendants order out the remainder of the standard fine granulated sugar, complainants let that matter rest pending negotiations about the Mauritius crystals. These negotiations will be referred to again in the discussion of the cross-bill. It is sufficient to say in this connection that such negotiations were unavailing, although continued until the latter part of November. Counsel for both parties were called in, but no settlement was reached.

On November 27, 1920, the complainants wrote to the defendants making a peremptory demand that defendants furnish shipping instructions for the remainder of the standard fine granulated sugar due upon the two contracts, and advising that unless such instructions were furnished "without further delay" the complainants would sell these sugars on defendants' account and hold defendants for the difference between the resale price and the contract price. Defendants made no reply to this letter. On December 3, 1920, and December 4, 1920, complainants wired that they had received an offer of 9 cents per pound for the said sugar, and advised, unless the defendants furnished a better offer within 24 hours, the offer of 9 cents would be accepted. The telegram of December 3, 1920, related to one of the contracts for standard fine granulated sugar, and the telegram of December 4, 1920, related to the other contract for standard fine granulated sugar. In each telegram the defendants were given until the following day at 11 a. m. to furnish a better offer. On December 6, 1920, the complainants sold the sugar due on these two contracts in Savannah at 9 cents per pound.

The difference between the contract price for the sugar so sold and the price obtained upon the resale amounted to $22,249.07, as before stated, and it was to recover this sum that the bill herein was filed.

The chancellor was of opinion that the parties by their conduct had extended the time for the performance of the contracts with reference to the standard fine granulated sugar, and that the complainants when they demanded performance in their letter of November 27, 1920, "without further delay," did not accord to the defendants a reasonable time in which to perform and, further, that

the complainants did not wait a reasonable time before they disposed of the sugar.

The chancellor based his conclusion upon *Wildberg Box Co.* v. *Darby,* 143 Tenn., 81, 223 S. W., 855; *Tennessee Fertilizer Co.* v. *International Agr. Corporation,* 146 Tenn., 451, 243 S. W., 81; and more particularly upon *Vosburg* v. *Southern Lumber & Mfg. Co.,* 147 Tenn., 647, 251 S. W., 41.

The case of *Vosburg* v. *Southern Lumber & Mfg. Co.,* reaffirms the rule announced in the other two cases just cited to the effect that, where the time fixed by the contract for performance is permitted to pass, both parties concurring, the time of performance thereafter becomes indefinite, and one party cannot put the other in default except upon notice and a reasonable time for performance given. There was a demand by the purchaser in that case for immediate compliance with a delayed contract to ship about 53,000 feet of pine lumber. The court held that a demand for immediate shipment under such circumstances was not permissible, but that the demand should have been for shipment within a reasonable time. Referring to the defendant, the court said:

"Had it been given a reasonable time, it might have complied, while, on the other hand, an immediate shipment might have been an impossibility."

The rule announced in these cases is undoubtedly equitable and just. What is a reasonable time for performance or completion of a contract delayed by consent must be determined upon the facts of each case as it arises. It was thought unreasonable in *Vosburg* v. *Southern Lumber & Mfg. Co.,* to require the defendants to immediately assemble, load, and ship 53,000 feet of pine lumber. Ob-

viously compliance with such a demand would require some little time. It was not reasonable to exact immediate compliance. In the case before us, if the complainants had demanded of the defendants anything that required time to do, a demand that defendants act immediately or "without further delay" would not have been justified. But the complainants only demanded "assortments and shipping instructions" as to the remainder of the sugar due under the contracts. That is to say, how much of the sugar was to be put in barrels and how much in bags, and how it was to be shipped.

Notwithstanding the argument to the contrary, we are unable to perceive why any time was needed to comply with this demand—why compliance required any delay. The letter containing the demand was mailed in Savannah November 27, 1920, and in the ordinary course of the mails reached defendants November 29, 1920. No reply was made to this letter, and the complainants on December 3, 1920, and on December 4, 1920, sent telegrams to the defendants. The complainants did not resell the sugar until December 6, 1920. The defendants in reality, therefore, were given a week to make up assortments and shipping instructions before complainants made a resale. We do not see why an intelligent manufacturer, in touch with his business, and familiar with its needs, should have to delay to determine assortments of goods in everyday use or to give shipping instructions concerning such goods.

In the case of *McKay Carriage Co.* v. *Southern Lumber & Mfg. Co.,* (decided April 5, 1924) 259 S. W., 1076, the court held that it was proper to require an immediate expression of intention from a party indicating a disposition to make default on a contract as to whether he in-

tended to comply with the contract. Little more was asked of the defendants in this case.

There is nothing in *Tennessee Fertilizer Co.* v. *International Agr. Corporation*, supra, contrary to what we have said herein. In that case the seller undertook to rescind the contract without any further opportunity whatever given to the purchaser to comply.

Where one of the parties unequivocally refuses to go on with a contract, it is not necessary for the other to make a demand upon the defaulting party for performance. In the case before us the defendants repeatedly refused to order out more of the standard fine granulated sugar unless their claim respecting the Mauritius crystals sugar was settled. As late as November 10, 1920, counsel for the defendants inquired of counsel for the complainants if any concessions would be made to the defendants, and added that if complainants were determined to do nothing whatever "then we should easily conclude what the next step should be." It thus appears that defendants all the while expressed their intention not to order any more of the standard fine granulated sugar unless their claim for damages on account of the other sugar was adjusted. Defendants have not since the controversy arose indicated any disposition whatever to complete the purchase of the standard fine granulated sugar, and are therefore in a poor attitude to cavil as to the sufficiency of the notice given to them.

Bearing in mind that the sugar market was falling during the autumn months of 1920, and according to the averments of the answer that the market continued to fall until the bill was filed, we do not think that complainants made the resale with too much expedition. Had they de-

layed the resale under such circumstances, on the falling market, the resale price would not have been binding upon the defendants. *Fleming Co.* v. *Edmonds,* 147 Tenn., 632, 250 S. W., 545.

Passing now to the cross-bill, there was no error in the decree of the chancellor dismissing same. The record discloses several insuperable obstacles to the prosecution of this cross-action.

In the first place the cross-complainants have not shown by a preponderance of the testimony that the Mauritius crystals sugar, when put on the cars in New York, was not all it had been represented to be. This was a foreign sugar, with which none of the parties hereto had previous experience. The complainants' broker negotiated the sale thereof to the defendants. At defendants' request the broker called up complainants' New York office over the telephone from Nashville and inquired about the sugar. According to the weight of the proof the complainants told the broker that they would not guarantee the sugar, but that it polarized around 98, and this was the representation made to the defendants. One of the defendants testified that some further representations were made to him, but he does not sustain this contention by a preponderance of the testimony.

It appears then that the Mauritius crystals sugar was sold upon a warranty or representation that it would polarize around 98. The sugar was also sold f. o. b. cars New York. When the sugar was unloaded from the steamer at New York it was tested by government officials for the assessment of duty. Sugar duties are based upon a polariscopic test. The proof of the government officials is that this sugar, tested in the required method, polarized

Lamborn & Co. v. Green & Green.

on an average at 99.4. All the samples tested over 99. Further testimony to the same effect is offered as to the condition of the sugar at New York. There is nothing to the contrary in the record as to its condition when loaded upon the cars in New York.

There is considerable proof offered by the defendants that the Mauritius crystals sugar was in bad condition when it reached Nashville. Samples were taken to Dr. Litterer, and he placed it under the polariscope, and the samples that he examined tested about 97.

It is suggested that the sugar acquired moisture and dirt in course of transit from New York to Nashville, which was responsible for the lower test made here. The proof of the condition of the sugar at Nashville is only material to the extent that it reflects on the condition of the sugar when loaded at New York. We are unable to say that the evidence of the Nashville witnesses is sufficient to overturn that of the government officials at New York. The integrity of the latter is in no way impugned, and we see no reason why they should not be entirely unbiased.

If, however, we should be mistaken in our conclusion as to the effect of the proof, the conduct of the defendants has nevertheless precluded them from any recovery on their cross-bill.

Upon the receipt of the Mauritius crystals sugar, as heretofore stated, the defendants advised complainants that the sugar was utterly unfit for use in defendants' business, and that they (defendants) would hold the sugar subject to complainants' order, and that, if no instructions were given respecting the same, they (defendants) would sell the sugar on complainants' account. The defendants

150 Tenn.—4.

thus elected to rescind the contract. The cross-bill filed by the defendants appears to be one for rescission. It was so treated by the court below, and is so characterized by defendants' counsel.

Notwithstanding this election to rescind, upon which it was the duty of the defendants to hold the sugar as the unwilling bailee of the complainants, defendants made an attempt to use the sugar in their business, in the manufacture of their products, and out of the 50 tons bought used all of it except 3 tons. Under such circumstances the defendants cannot have rescission. They are not in a position to return the consideration of the contract sought to be vacated. We have discussed this question in an opinion filed today in the case of *Hawkins* v. *Byrn*, 261 S. W., 980, and considered the authorities. In an action of rescission, as a condition to the relief sought, the restoration of the consideration will be decreed save in exceptional cases. Since the defendants have used the sugar, have consumed the consideration, they cannot restore it, and are not entitled to rescission. It may be added that this use of the sugar was made without the knowledge of complainants.

Chapter 118 of the Acts of 1919, the Uniform Sales Act, in a case of the sale of goods such as the one before us, somewhat enlarges the rights of the parties to a contract upon rescission. Section 69, subsec. 5, authorizes a buyer entitled to rescind and having elected to do so, if the seller refuses to accept the return of the goods, to hold a lien upon such goods with the remedies for the enforcement of such lien allowed an unpaid seller by section 53 of the act. Section 53 gives to the unpaid seller a right of resale and some other rights, but no right to the use of the goods.

We find nothing in the Uniform Sales Act to justify the course of defendants in this matter upon the theory of rescission.

The chancellor was of opinion that, having elected to rescind, the defendants were bound by their election, and that no remedy for the recovery of damages was now open to them. This was no doubt a proper conclusion. *Montlake Coal Co.* v. *Chattanooga Co.*, 137 Tenn., 440, 193 S. W., 1057.

Aside from the effect of their election of remedies, the defendants could not recover any damages on this record.

If defendants had elected to retain the Mauritius crystals sugar and sue for damages, and had proven a breach of warranty of quality, the measure of damages would have been the difference between the actual value of the sugar and the value had its quality been as represented. Acts 1919, chapter 118, section 69, subsection 7; *Shwab* v. *Walters*, 147 Tenn., 638, 645, 251 S. W., 42. There is no proof in the record as to the actual value of the Mauriaius crystals sugar—nothing upon which we could base the calculation indicated.

Although the defendants promptly informed complainants that an attempt to use this sugar in the manufacture of defendants' goods would be disastrous, nevertheless defendants proceeded to do that very thing. Certainly the defendants could not have a recovery for the enhanced damages they sustained by reason of the experiments made with this sugar, in view of defendants' appreciation of the probable results.

Without further discussion, we are not able to see any theory upon which the cross-bill could be maintained. Whatever merit there may have been in the defendants'

claims respecting this Maritius crystals sugar originally such claims have been rendered unavailable by the procedure of defendants in the matter. They called in their counsel too late.

In so far as the decree below dismissed the cross-bill it will be affirmed. The decree dismissing the original bill will be reversed, and a decree entered here for the complainants without interest. The defendants will pay all the costs.