In re **EDGEWATER MOTEL, INC.**, Debtor.

**BLAINE–HAYS CONSTRUCTION CO.**, Plaintiff,

v.

**UNION PLANTERS NATIONAL BANK** and Edgewater Motel, Inc., Defendants.

Bankruptcy No. 3–86–00599.
Adv. No. 3–87–0081.

United States Bankruptcy Court, E.D. Tennessee.

March 23, 1988.

Doris C. Allen, Knoxville, Tenn., for Edgewater Motel, Inc.

John A. Lucas, Knoxville, Tenn., for Blaine–Hays Const. Co.

John A. Walker Jr., Knoxville, Tenn., for Union Planters Nat. Bank.

## MEMORANDUM

JOHN C. COOK, Bankruptcy Judge.

This case involves an action by a contractor against the bankrupt owner of a construction project and its principal lender. Contending that it was not paid its last draw request on the construction project, the contractor seeks compensatory and punitive damages, an equitable lien, and equitable subordination against the principal lender based upon a number of legal theories. The parties previously consented to the entry of a final judgment by this court pursuant to 28 U.S.C. § 157(a)(2). Jurisdiction lies under 28 U.S.C. §§ 1334 and 157. Having conducted a two-day trial on the issues raised in this lawsuit, the court now enters its findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. References to plaintiff's exhibits will be designated "Px." and the exhibit number.

References to defendant's exhibits will be designated "Dx" and the exhibit number.

### Findings of Fact

1. Blaine–Hays Construction Company ("Blaine–Hays") is a Tennessee corporation engaged in the general contracting business with its principal place of business in Knoxville, Tennessee.

2. Union Planters National Bank ("UPNB") is a national banking association with its principal office in Memphis, Tennessee.

3. Edgewater Motel, Inc. ("Edgewater") is a Tennessee corporation which owns the project involved in this suit. Edgewater filed a petition for relief under chapter 11 of the Bankruptcy Code on March 25, 1986.

4. In 1983 the debtor, Edgewater and its principal shareholder and officer, Mr. R.B. Hailey, began plans for the construction of the Edgewater Motel in Gatlinburg, Tennessee (the "project"). Mr. Hailey began negotiating with Dorman Blaine of Blaine–Hays in the hope that Blaine–Hays would become the general contractor for the project. Mr. Hailey also commenced efforts to obtain a construction loan from UPNB and permanent financing from Security Federal Savings and Loan Association. Mr. Hailey obtained a written commitment from Security Federal dated September 30, 1983 (Px 1A).

5. On December 27, 1983, Mr. Fountain Barksdale of UPNB prepared a credit proposal for submission to UPNB's Senior Loan Committee (Px 1B). Mr. Barksdale was the UPNB officer who was initially responsible for the construction loan to Edgewater.

6. During the negotiation period in the latter part of 1983, Dorman Blaine met with Mr. Hailey, Mr. Barksdale, and Miles McMahan, an employee of Mr. Hailey's, and discussed the project. Mr. Blaine was not willing to rely upon Mr. Hailey to provide the funds needed for construction. He was told by Mr. Hailey and later by Mr. Barksdale that the construction loan would come from UPNB.

7. Union Planters Mortgage Company, a division of UPNB, provided Mr. Hailey with a commitment letter dated January 17, 1984 (Px 1C) setting forth the terms upon which it would make a construction loan to Edgewater. The loan was to be in a principal amount of $7 million and was to be secured by a first deed of trust on the project premises. The commitment letter required the borrower to pay certain "costs" in connection with the loan and acquisition and construction of the property from funds other than the loan proceeds. Among these costs were $1.5 million for "Leased Equipment." The commitment letter also required copies of executed leases with Walter Heller & Company covering "all furniture, fixtures, equipment, elevators, fireplaces and heating and air conditioning units" to be reviewed and approved by UPNB prior to closing of the construction loan.

8. A "preliminary budget" was attached as Exhibit B to the commitment letter. That budget was as follows:

|  | Total Cost | Amount Paid | Balance to be Paid |
|---|---|---|---|
| Land acquisition | 883,740 | 225,000 | 658,740 |
| Building | 5,585,000 | 600,000* | 4,985,000 |
| Construction loan Interest | 600,000 | — | 600,000 |
| Permanent loan/ brokerage fees | 298,000 | 172,100 | 125,900 |
| Construction loan fees | 114,500 | — | 114,500 |
| Legal and recording fees | 20,000 | — | 20,000 |
| Survey, soil testing, etc. | 18,000 | 15,000 | 3,000 |

|  | Total Cost | Amount Paid | Balance to be Paid |
|---|---|---|---|
| Architectural & engineering fees | 350,000 | 50,000 | 300,000 |
| Contingency | 350,000 | 175,000** | 175,000 |
| Pre-opening expenses . | 300,000 | — | 300,000 |
| Furniture, fixtures and equipment | 900,000 | 900,000* | — |
| TOTAL | 9,419,240 | 2,137,100 | 7,282,140 |

\* $600,000 of the building cost (elevators, fireplaces, heating, and air conditioning units) as well as $900,000 of furniture, fixtures, and equipment will be leased.
\*\* To be covered by a letter of credit.

---

9. The amounts in the right hand column of the budget were to be paid from the construction loan proceeds, plus 12 monthly cash contributions by the owner of $23,500 each. The amounts in the second column supposedly were already paid or were to be paid by the owner from other sources.

10. According to the commitment letter and budget, $4,985,000, the construction loan proceeds and the owner's equity contributions, would be used to pay Blaine–Hays for the cost of building the project. The remaining $600,000 needed to pay the contractor to install elevators, fireplaces, heating and air conditioning units would come from a lease financing arrangement with parties other than UPNB.

11. By this time Blaine–Hays through Dorman Blaine had tentatively agreed to become general contractor for the project. The terms of the construction contract required Blaine–Hays to obtain performance bonds to ensure Blaine–Hays' performance under the contract. Although Dorman Blaine had been told by both Mr. Hailey and Mr. Barksdale that UPNB would make the construction loan, Mr. Blaine wanted firm assurance from the bank that construction funds would be available for the construction.

12. Sometime prior to entering into the construction contract, Mr. Blaine telephoned Mr. Barksdale who assured him that UPNB's construction loan would cover the contractual price of the construction contract, namely, $5,585,950. Mr. Barksdale also agreed to confirm in writing this representation.

13. After receiving Mr. Barksdale's assurance, Blaine–Hays informed its bonding company that UPNB had verified that its construction loan would cover the construction contract and that a letter confirming the oral representations would be forthcoming.

14. Blaine–Hays and the owner thereafter signed a construction contract for a lump sum amount of $5,585,950 (the "construction contract") (Px 2B). Although the construction contract does not show the date it was signed, it recites that it was made as of February 20, 1984.

15. The construction loan made to Edgewater by UPNB was closed on March 1, 1984.

16. Shortly before the closing of the construction loan between Edgewater and UPNB, Dorman Blaine instructed Miles McMahan not to turn over the construction contract to UPNB before receiving a commitment letter from the bank confirming the earlier representations by Mr. Barksdale on the financing. Mr. Blaine gave Mr. McMahan a form letter that he wanted Mr. Barksdale to retype on UPNB stationery. Mr. McMahan followed Mr. Blaine's instructions.

17. The commitment letter received back from Mr. Barksdale on UPNB stationery was signed by Mr. Barksdale and was dated February 28, 1984. Although there was some conflict in the evidence as to

whether the words in the letter were those of Mr. Blaine or Mr. Barksdale, the letter and its contents were adopted, if not written, by Mr. Barksdale. The representations contained in the letter were the same representations made to Mr. Blaine by Mr. Barksdale to induce Mr. Blaine to enter into the construction contract and obtain performance bonds. The letter reads as follows:

February 28, 1984

Blaine–Hays Construction Company

9047 Executive Park Drive

Knoxville, Tennessee

Gentlemen:

This is to confirm that Union Planters National Bank has made a construction loan to Edgewater Motel, Inc. for the construction of a 210 room motel to be located in Gatlinburg, Tennessee pursuant to the terms of a certain Construction Loan Agreement dated March 1, 1984 (the "Agreement"), between Union Planters National Bank, as lender and Edgewater Motel, Inc. and R.B. Hailey, as borrower. The loan contains $5,585,-950.00 to fund the cost of construction, pursuant to the Agreement. Assuming no default under the Agreement, progress payments will be made monthly upon receipt of the required documentation approved by the Architect and the Owner in conformance with the Agreement and other loan documents executed in connection therewith.

Very truly yours,

UNION PLANTERS NATIONAL BANK

[Signature]

By: Fountain Barksdale

Vice President

18. The first sentence of the letter clearly states that UPNB "has made" a construction loan to Edgewater for construction of the motel pursuant to a "Construction Loan Agreement (the Agreement)." The second sentence of the letter clearly states that "[t]he loan," obviously referring to the construction loan mentioned in the first sentence, "contains $5,585,950.00 to fund the cost of construction, pursuant to the Agreement." The representation that the bank construction loan contained $5,585,950 to fund the construction was false. The loan contained only $4,703,000 to fund the cost of construction, pursuant to the Agreement. An additional $282,000 was to come from the owner's equity contributions. The other $600,000 was to be provided from another source under a lease financing arrangement. While the false representation was not intentional, it was nevertheless a false representation negligently made by UPNB in the course of its business.

19. Mr. Blaine was never told by UPNB or anyone else that the construction loan contained only $4,703,000 to fund the cost of construction. Based upon Mr. Barksdale's representation, Mr. Blaine and Blaine–Hays were led to believe that UPNB loan funds were available to cover the entire cost of the construction contract.

20. Because UPNB through Mr. Barksdale clearly represented to Blaine–Hays that the bank's construction loan contained $5,585,950 to fund the construction, a representation later confirmed by the letter dated February 28, 1984, it was reasonable for Blaine–Hays to rely upon this representation without examining the underlying construction loan agreement and accompanying papers.

21. Edgewater established three accounts at UPNB in connection with the construction loan. Account No. 239–0090288–01 (the "construction account") was used to pay the owner's draw requests. Typically, when UPNB advanced money pursuant to the construction loan, it deposited the money in the construction account. Account No. 8006717 (the "escrow account") was used for deposit of the $23,500 monthly payments required to be made by Mr. Hailey pursuant to the construction loan agreement. Account No. 8006431 (the "retainage account") was used for deposit of Blaine–Hays' earned retainage.

22. Account No. 8006431 or the retainage account was actually a money market savings account opened in the name of Edgewater. The bank was not instructed to open the account as an escrow account nor did Edgewater or Blaine–Hays obligate

the bank to treat the account as an escrow account. Since there was no obligation on the part of the bank to treat the account as an escrow account, the bank obviously did not put up any security to ensure such an obligation. Although no checks were written on the account, a signature card for Edgewater was filled out and on file. Except on one occasion when UPNB withdrew funds from the retainage account to correct a clerical mistake made in a deposit, all withdrawals from the account were made pursuant to instructions from Edgewater.

23. Section 4.01 of the construction loan agreement required the owner to deposit in the escrow account twelve monthly payments of $23,500 each (a total of $282,000). UPNB was required to advance these funds "in connection with the construction of the project in accordance with the terms hereof...." The January 17 commitment letter (Px 1C) also stated that the payments would be used to pay the cost of construction in excess of the loan amount, based upon the preliminary budget.

24. Following the loan closing John Whooley of UPNB assumed responsibility for administering the loan. UPNB retained Mr. John E. Acuff, a consulting engineer, to act as an "independent inspector" for the project. Mr. Acuff's duties were set forth in a letter to him dated March 26, 1984, from Mr. Whooley, which he signed and accepted on March 28, 1984 (Px 4A). This letter required Mr. Acuff, among other things, to review Blaine–Hays' certificates for payment and to visit the project site each month to determine if there were sufficient construction loan funds remaining to complete the project according to plans and specifications.

25. Although Mr. Acuff did visit the project site on a number of occasions and submitted fifteen written reports to UPNB, none of these reports ever stated whether there were "sufficient construction loan funds remaining to complete the project according to plans and specifications" as required by the letter of March 26, 1984 (Px 4A).

26. After construction began, Blaine–Hays submitted applications for payment approximately every month. When it received these applications, Edgewater typically would complete its own draw request adding its other costs and expenses. Ms. Crystel Burke, who was Mr. Hailey's secretary, would then forward these draw requests to UPNB with a cover letter signed by her (Px 7B–7R).

27. The owner charged project expenses to eleven different categories, which were numbered 1 through 11 on its draw requests. These categories correspond to the eleven categories on the budget shown on previously-mentioned Exhibit B.

28. In addition to the eleven categories of expenses as shown on the project budget, the owner's draw requests also included two additional lines (nos. 12 and 13). These were for retainage accrual and interest on retainage. When Blaine–Hays submitted its applications for payment, 10 percent of the amount due for construction progress was withheld as retainage (this was reduced to 5 percent of the total contract price beginning with application no. 10). This earned retainage was always accounted for separately (as was the interest earned on retainage) and was deposited into the retainage account.

29. Typically, when UPNB received an owner's draw request, it funded the construction loan by transferring the amount of earned retainage directly into the retainage account and credited the construction account for the balance of the draw. It would then debit the construction account for the interest due it on its loan. The remaining funds in the construction account were then used by Edgewater to pay the project costs and expenses, including Blaine–Hays' application for payment. This procedure was followed on the first thirteen draw requests between March 31, 1984, and April 1, 1985, which were paid in full.

30. On May 1, 1985, Blaine–Hays submitted its application for payment no. 14. This application included $413,079 in construction progress (Px 9A).

31. Blaine–Hays' application no. 14 was forwarded to UPNB by letter dated May 15, 1985, together with owner's draw re-

quest no. 14 (Px 9B). In addition to stating construction progress of $413,079, application 14 showed retainage of $288,397 or 5 percent of the total contract price. This was the same retainage shown on application no. 13.

32. Owner's draw request no. 14 submitted to UPNB showed only $114,412 "work in place" for Item 2 "Building." It also showed that the construction loan budget for "Building" had been exhausted.

33. When Edgewater forwarded draw request no. 14 to UPNB, it apparently was unaware that there were not sufficient funds remaining in the construction loan to pay this draw request because the transmittal letter asked UPNB to transfer $495,-528.54 in the Edgewater's construction account to pay the full amount of owner's draw request no. 14 (Px 9C).

34. When UPNB received owner's draw request no. 14, however, it discovered there were not sufficient funds remaining in the construction loan to pay it. On May 20, 1985, there was only $111,423.34 remaining in the construction loan to pay the $495,-528.54 draw request. Demetra Quinn, a UPNB loan officer, prepared a memo (Px 9E) stating that draw no. 14 would be paid as follows:

| | | |
|---|---|---|
| $111,423.34 | – | from loan funds |
| 292,306.93 | – | from the Hailey Escrow account (# 8006717) |
| 91,798.27 | – | by borrower from lease funds |
| $495,528.54 | – | TOTAL |

35. The ending balance as shown on the last statement (dated 4–30–85) for the escrow account was $292,306.93 (Px 9K). It apparently was UPNB's intent to withdraw all the funds from the escrow account to pay draw request no. 14, and for Edgewater to fund the balance of that draw from the remaining construction loan funds and from unspecified "lease funds."

36. The next day, May 20, 1985, in accordance with Ms. Quinn's memo, UPNB withdrew all of the funds available in the escrow account, namely $292,306.13 and transferred this sum to the construction account. It also credited to the construction account the amount of $403,730.21, which was the $292,306.13 debited to the

Hailey escrow account, plus the "remaining amount of the loan," $111,423.32 (Px 9F). UPNB's general ledger entry for this transfer described it as the "Final Draw Request" (Px 9F, p. 2).

37. As of May 21, 1985, however, funds in the amount of $91,798.27 were still needed to complete the payment of draw request no. 14. Ms. Burke's memo indicated that the additional $91,798.27 would be furnished by the borrower (Edgewater) from lease funds.

38. On June 3, 1985, Blaine–Hays received a check from Dover–Elevator Company for $165,849 (Px 9H) made payable to Blaine–Hays. The check was endorsed by Blaine–Hays' controller over to Edgewater. The evidence did not disclose why the Dover Elevator check was made out originally to Blaine–Hays. At this point in time, Dover Elevator was not indebted to Blaine–Hays.

39. A telephone conversation apparently took place between John Whooley and Crystel Burke wherein draw request no. 14 was discussed. A letter dated June 3, 1985, from Ms. Burke to Mr. Whooley confirming the telephone conversation set forth instructions on how draw request no. 14 was to be paid (Px 9G). The instructions corresponded to the treatment of draw request no. 14 contained in Demetra Quinn's memo.

40. Enclosed with the June 3 letter to be deposited into the Hailey escrow account was the Dover Elevator check in the amount of $165,849. Of that amount, $91,-798.27 was transferred to the construction account to complete payment of draw request no. 14, $65,764.56 was transferred to UPNB to pay interest on the construction loan, and $74,050.73 was left in the Hailey escrow account (Px 9J). With the addition of funds from the Dover Elevator check, draw request no. 14 was paid in full.

41. The funds from the Dover Elevator check, namely $165,849, were charged against the budgeted $600,000 lease funds. As noted previously, these lease funds were supposedly part of the financing package making up the total construction contract price of $5,585,950. As previously

noted, although UPNB through Mr. Barksdale represented to Blaine–Hays that the bank loan contained $5,585,950 to finance the construction, in actuality, the bank loan contained only $4,985,000 with the balance of $600,000 to be supplied through so-called lease funds from a source other than the bank.

42. It appears that in January 1985, Edgewater entered into a lease agreement with a company by the name of Borg–Warner Leasing (Px 6B). Pursuant to the lease agreement, furniture, fixtures, and equipment were leased to Edgewater for installation by Blaine–Hays into the project. Apparently, the installation costs were to be paid for out of advanced funds from Borg Leasing to Edgewater (Px 6A). The evidence did not reveal, however, how this financing arrangement was supposed to work.

43. Blaine–Hays' project manager for the Edgewater construction project was Don Sterchi. On May 17, 1985, he wrote Edgewater employee Miles McMahan and stated in part:

> To recap our conversation of this morning, I am sending a letter to the affected subcontractors and suppliers concerning the "Borg–Warner" invoicing. (Dx Ex. 15).

On May 20, 1985, Don Sterchi wrote a letter to Dover Elevator Company stating in part:

> As part of the financing package on the Edgewater Hotel, the Owner has entered into a leasing agreement with "Borg–Warner Leasing.... (Dx Ex. 16).

44. Although the letters written by Don Sterchi show that Blaine–Hays was aware at least by May 1985 that Edgewater was getting some type of financing from a source other than UPNB, Mr. Blaine testified that it was the understanding of Blaine–Hays that this financing was additional financing over and above the financing agreed to by UPNB. At no time was Blaine–Hays told that less than $5,585,000 was available in loan funds from the bank. At no time was Blaine–Hays told that its payments were coming from a source other than the bank loan funds committed to the project. Moreover, at the time draw request no. 14 was paid, Blaine–Hays was not advised that the bank's construction loan had been fully disbursed.

45. The proof revealed that by May 20, 1985, there were insufficient funds remaining to complete construction and that the entire project was over budget by approximately $259,000. Blaine–Hays continued working on the project under the illusion that bank loan funds were still available to fund the remaining work.

46. On June 3, 1985, Blaine–Hays submitted its application for payment no. 15 (Px 10A). It included $122,057 as current payment due. Retainage remained at $288,397, 5 percent of the total contract price.

47. On July 12, 1985, the owner submitted owner's application no. 15 requesting a total draw of $211,737.25, including interest of $70,425.22 (Px 10B). Four days earlier, on July 8, 1985, UPNB had already debited the escrow account in the amount of $70,425.22 to pay interest to itself in connection with this draw. This amount was the remainder of the proceeds of the Dover Elevator check. Also on July 12, 1985, the owner sent a check for $137,311.94 to UPNB for deposit into the escrow account. Four days later, on July 13, 1985, UPNB transferred that amount, plus an additional $4,000 from the escrow account to the construction account. This amount was used to pay draw no. 15, less the interest, which UPNB had already paid to itself. Blaine–Hays' application no. 15 was paid in full thereafter.

48. Blaine–Hays' application for payment no. 15 included $122,057 in construction progress. When the owner sent UPNB the check for $137,311.94 to fund this draw request, that amount, like the Dover Elevator check, was charged against item 11 of the budget. Also, like the Dover Elevator check, these "lease funds" were then used to fund the owner's draw, including Blaine–Hays' application for payment and the other expense shown on PX 10B. Therefore, UPNB once again knew that the $600,000 in "lease funds" that supposedly

were budgeted to pay Blaine–Hays actually were being used for other purposes.

49. In both instances in which Blaine–Hays received a portion of these "lease funds," they were not paid to it separately, but were transferred through the escrow account to the construction account, and then paid· to Blaine–Hays (in part) in the form of a check drawn on the construction account. Because Blaine–Hays was receiving its payment in the usual manner, it was not put on notice that its payments were coming from a source other than bank loan funds.

50. Blaine–Hays' application no. 15 was ultimately paid in full.

51. The construction loan agreement between UPNB and Edgewater provided that failure of the project completion date to occur on or prior to May 1, 1985, constituted an event of default (Px 3D). The construction contract between Blaine–Hays and Edgewater, received by UPNB at loan closing, recited a final completion date of June 1, 1985 (Px 2B). Although the project was not completed by May 1, 1985, UPNB waived the time provision contained in the construction loan agreement by closing its loan with knowledge that the construction contract provided for a completion date after May 1, 1985; by failing to give notice of any default; and by continuing to make progress payments after May 1, 1985.

52. On July 23, 1985, Blaine–Hays submitted its application for payment no. 16 (Px 11A). It was forwarded to UPNB by the owner on August 20, 1985. It included $129,201 in current payment due, and $218,397 in retainage that had been earned previously. Application no. 16 reduced the retainage to $70,000.

53. On August 21, 1985, UPNB transferred $234,908.52 from the retainage account to the construction account, leaving a balance in the retainage account of $70,000 on that date (Px 11C, 11D). This sum was used by the owner to make a partial payment on Blaine–Hays' application for payment no. 16.

54. On September 17, 1985, Blaine–Hays submitted its application for payment no. 17 in the amount of $276,229.48. This represented the $112,689.48 in unpaid retainage due from application no. 16, $93,-540 in additional construction, and $70,000 in final retainage. No amount of this application has ever been paid to Blaine–Hays.

55. On September 27, 1985, UPNB debited the retainage account in the amount of $70,000, and credited this amount to the construction account. The owner then drew a $70,000 check on the construction account and deposited it into its account at First National Bank of Gatlinburg, where it apparently was used to off-set prior overdrafts by the owner. None of this money was paid to Blaine–Hays. After this transaction there was $1,484.90 left in the retainage account (Px 12H).

56. On December 12, 1985, UPNB debited the retainage account in the amount of $1,477.72 (Px 12J). It paid this amount to the owner. Blaine–Hays did not receive any of this remaining money.

57. In all, Blaine–Hays was paid $5,424,340.52 for its work on the project. Blaine–Hays' final application for payment no. 17 in the amount of $276,229.48 submitted on September 17, 1985, remains unpaid.

*Conclusions of Law*

A.

■ The plaintiff predicates recovery of damages against UPNB upon a number of theories. The most viable theory is that of negligent misrepresentation. The representations at issue are the oral representations made by UPNB employee, Fountain Barksdale, to Dorman Blaine concerning the amount of bank loan funds available to fund the construction costs of the Edgewater Motel project. Those oral representations were later confirmed in the letter of February 28, 1984, from Mr. Barksdale to Dorman Blaine.

The tort of negligent misrepresentation is succinctly described in *Restatement (Second) of Torts*, § 552. That section reads in relevant part as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a

pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... the liability stated in Subsection (1) is limited to loss suffered

   (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

   (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

UPNB concedes that Tennessee recognizes the tort of negligent misrepresentation as set forth in § 552 of the Restatement. *See Tartera v. Palumbo,* 453 S.W.2d 780 (Tenn.1970); *Merriman v. Smith,* 599 S.W.2d 548 (Tenn.App.1979).

The findings in this case establish that the plaintiff has met its burden of proof on the issue of negligent misrepresentation. Mr. Barksdale, on behalf of UPNB, negligently represented to Mr. Blaine and Blaine–Hays that the UPNB construction loan contained $5,585,950 to fund the cost of the construction. The representation, made in the course of the bank's business, was false. Mr. Barksdale made the representation to Mr. Blaine realizing that Blaine–Hays would rely upon the representation in committing itself to the construction project. Although Blaine–Hays' surety on the performance bond wanted the representation in writing as a prerequisite for issuing the bond, Mr. Blaine testified that he also needed assurance himself as to the source of financing.

The representation from the bank that the loan contained $5,585,950, the full price of the construction contract, led Blaine–Hays to believe that sufficient bank loan funds up to that amount were available to fund the project. With this erroneous information, Blaine–Hays continued to work on the project even after the bank loan funds were depleted. If Blaine–Hays had been aware that only $4,703,000 in bank loan funds were available for construction, Blaine–Hays could have protected its interest before entering into the construction contract by insisting that other, acceptable financing was in place. Also, if Blaine–Hays had known that only $4,703,000 in bank funds were available to fund the construction, it could have stopped work when those funds were exhausted until assured that future payment would be made. As it turned out, Blaine–Hays proceeded with the construction of the project without knowing that the bank loan had been used up and without having the opportunity to approve or reject the alternative financing arrangement entered into by the debtor.

While Blaine–Hays may have become aware in May 1985 that some type of additional financing had been obtained by the debtor, it did not know this additional financing was part of the $5,585,950 in funds supposedly available through the bank. Neither Blaine–Hays nor the bank knew how this additional financing was supposed to function. If Blaine–Hays had known from the beginning that part of the construction funds payable to it were to come from another source, it could have insisted upon proper safeguards to ensure the money was available when needed.

In view of the bank's clear representation that the UPNB loan contained $5,585,950 to fund the construction pursuant to the loan agreement, the court rejects the bank's argument that Blaine–Hays was contributively negligent in failing to review the bank loan agreement and accompanying documents. It was certainly reasonable for Blaine–Hays to rely upon the straight-forward and explicit representation from UPNB without having to investigate the accuracy of the representation.

UPNB also argues that the letter of February 28 stated that monthly progress payments would be made assuming no default under the loan agreement. The construction loan agreement provided that failure of the completion date to occur on or prior to May 1, 1985, constituted an event of

default. Even though the project was not completed by that time, the bank gave no notice of a default and continued making progress payments in accordance with the agreement. Moreover, the construction contract between Blaine–Hays and Edgewater, furnished to UPNB at the time of loan closing, provided that the project's final completion date would be June 1, 1985. UPNB accepted the construction contract without objection.

■ Even though a contract may call for performance at a certain time, if the parties by their conduct indicate an intention to regard the contract as still in force after default, the time provision is waived and the parties are estopped from asserting that there was a breach of the contract for failure to perform at the original time. *Lamborn & Co. v. Green,* 150 Tenn. 38, 262 S.W. 467 (1923); *Farris v. Ferguson,* 146 Tenn. 498, 242 S.W. 873 (1922); *Petway v. Loew's Nashville & Knoxville Corp.,* 22 Tenn.App. 59, 117 S.W.2d 975 (1938).

■ Not only did the bank continue making loan payments after May 1, 1985, without giving notice of any event of default, but it also failed to object to the completion date of June 1, 1985, contained in the construction contract. If notice of default had been given and progress payments immediately stopped, Blaine–Hays could have halted construction at that point. Instead, UPNB continued to perform under the construction loan agreement with every intention of fulfilling the agreement despite the passing of the May 1, 1985, completion date. UPNB cannot now assert that nonpayment of the last draw request should be excused because of Edgewater's failure to complete the project by May 1, 1985.

■ As a consequence of its justifiable reliance upon the bank's false representation, Blaine–Hays was damaged in the amount of $161,609.48, the difference between $5,585,950, the amount falsely represented, and $5,424,340.52, the amount paid to Blaine–Hays.

### B.

■ The plaintiff also seeks recovery against UPNB for wrongful conversion of retainage. This theory of recovery is predicated upon an alleged violation of Tenn. Code Ann. § 66–11–144 (Supp.1987). That statute provides in relevant part:

> (a) Whenever, in any contract for the improvement of real property a certain amount or percentage of the contract price is held back by the owner or contractor, that retained amount shall be deposited in a separate escrow account with a third party giving proper security for the performance of their obligation.

\* \* \* \* \* \*

While Edgewater may have had a duty under § 66–11–144 to set up an account in compliance with the statute, *Rentenbach Engineering Co. v. General Realty Ltd.,* 707 S.W.2d 524, 528 (Tenn.App.1985), it failed to create such an account. The so-called retainage account established in this case was an ordinary money-market savings account opened in the name of Edgewater. A signature card for Edgewater was filled out and filed. The bank received no special instructions regarding this account nor did it enter into an agreement obligating itself to treat this account as an escrow account. Moreover, the bank was not required to put up any security to ensure the performance of an obligation to treat the account as an escrow account. Hence, UPNB cannot be faulted for complying with Edgewater's instructions regarding withdrawals from Edgewater's own money-market account.

### C.

■ The plaintiff also seeks recovery from UPNB based upon alleged negligence in administering the construction loan. While the plaintiff concedes that the construction loan agreement does not create a duty, actionable in tort, running from UPNB to Blaine–Hays, plaintiff appears to argue that the false representation made by Mr. Barksdale to Blaine–Hays created a duty on the part of UPNB to administer the loan in accordance with Mr. Barksdale's representation.

Mr. Barksdale represented to Blaine–Hays that the loan contained $5,585,950 to

fund the construction. Blaine–Hays was damaged by UPNB only to the extent that the representation was false. The administration of the actual loan funds did not constitute the actionable tort in this case; rather, the actionable tort was the negligent misrepresentation that additional loan funds were available. *Cf. Forest, Inc. v. Guaranty Mortgage Co.*, 534 S.W.2d 853 (Tenn.Ct.App.1975), *cert. denied* (Tenn. 1976). Thus, the plaintiff would not be entitled to recover under the theory of negligent loan administration.

### D.

■ The plaintiff seeks to have an equitable lien impressed upon the project in this case.

■ It has been said that the doctrine of equitable lien, in certain aspects, is not essentially different from the doctrine of subrogation. It is applied in cases where the law fails to give relief and justice would miscarry but for its declaration. *Milam v. Milam*, 138 Tenn. 686, 200 S.W. 826 (1917); *Shipley v. Metropolitan Ins. Co.*, 25 Tenn.App. 452, 158 S.W.2d 739 (1941). The Tennessee Supreme Court in *Milam* described the circumstances justifying the recognition of an equitable lien.

> Even in the absence of an express contract, a lien, based upon the fundamental maxims of equity, may be implied and declared by a court of chancery out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings.
>
> There must be an intent to make the particular property, real or personal, a security for the obligation; but, that intent being clear, equity will treat an agreement to give a mortgage or lien, as effective to create an equitable lien, where money has been parted with on faith that there would be a compliance. [Citations omitted.]

*Milam v. Milam* at 691–92, 200 S.W. at 828.

In addition, the defendant against whom relief is sought must have title to the real property against which an equitable lien is claimed. *Sondgeroth v. Carrington*, 650 S.W.2d 737, 742 (Tenn.App.1982).

In the instant case, the legal title to the project is held by the debtor Edgewater, not UPNB. Obviously, there was no intent on the part of any of the parties that the project secure an indebtedness running from UPNB to Blaine–Hays which arose in tort. *Cf. Greer v. American Security Ins. Co.*, 223 Tenn. 390, 445 S.W.2d 904 (Tenn. 1969). Finally, Blaine–Hays has an adequate remedy at law in this case in its tort action for a judgment awarding damages against UPNB, a judgment UPNB will certainly be able to pay.

The court does not find the doctrine of equitable lien to be applicable in this case and therefore will not impress such a lien on the project.

### E.

■ The plaintiff also seeks equitable subordination of UPNB's lien pursuant to 11 U.S.C. § 510(c).

■ Equitable subordination is an extraordinary remedy. The misconduct which warrants the imposition of this remedy must be substantial. *First Nat'l. Bank v. Charles Blalock & Sons, Inc. (In re Just for the Fun of It of Tennessee, Inc.)*, 7 B.R. 166 (E.D.Tenn.1980). Gross or egregious misconduct must be established in non-insider cases. *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services)*, 29 B.R. 139 (Bankr.E.D.N.Y.1983); *Berquist v. First Nat'l Bank (In re American Lumber Co.)*, 5 B.R. 470 (D.Minn.1980).

The conduct which damaged the plaintiff in the instant case was negligent conduct. It was neither intentional misconduct nor substantial misconduct. The facts and circumstances of this case do not justify resort to equitable subordination.

### F.

■ The court finds no basis for allowing recovery upon the other theories cited by the plaintiff. Also, the evidence in this case does not support plaintiff's claim for punitive damages. The court will allow, however, interest upon the assessed

damages at the rate of 6.5 percent from September 27, 1985, a date ten days following the submission of plaintiff's last application for payment. *See* Tenn.Code Ann. § 47–14–123.

A judgment will enter in accordance with the court's findings of fact and conclusions of law.