97 F.3d 1451
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CHRYSLER CAPITAL CORPORATION, INC., Plaintiff-Appellee,
v.
GMX COMMUNICATIONS, INC.; Holder Communications Corporation
of Louisiana; Holder Communications Corporation; GMX
Corporation of Tennessee, Inc.; Joe K. Shaw; Jack M.
Norman; Radiosouth of Mississippi, Ltd., Defendants,
Gary Stevens, Receiver-Appellee,
Arnold Malkan, by and through Audrey Malkan, his
successor-in-interest; Ohio Broadcast Associates,
Appellants.
 Nos. 94-6624, 95-5165.
 United States Court of Appeals, Sixth Circuit.
 Sept. 26, 1996.
 
 Before: JONES, BOGGS, and COLE, Circuit Judges.
 PER CURIAM.
 
 
 1
 Appellants Arnold Malkan and Ohio Broadcast Associates appeal the district court's order granting a court-appointed receiver authority to sell a radio station. For the reasons which follow, we affirm the order of the district court.
 
 I.
 
 2
 This case originates with the appointment of Gary R. Stevens by the district court to serve as a receiver of several radio stations for the benefit of Chrysler Corporation. Pursuant to the powers vested in him by the district court, Stevens (the "Receiver") offered two radio stations, WRLT (FM) and WHNK (AM), for sale. The successful bidders were Arnold Malkan and Ohio Broadcast Associates ("OBA"), a related entity, and three other parties, William O. Barry, Alden Horton, and Lester Turner (collectively, the "Buyers"). The sale of the two radio stations was authorized by order of the district court after a lengthy court-approved bidding procedure. An Asset Purchase Agreement ("Agreement") was executed between the Receiver and the Buyers and approved by the district court.
 
 
 3
 Before the parties were able to close the sale, a dispute erupted among the Buyers. The dispute centered on Horton's role in the management of the station and the relative ownership interests of the Buyers. It is uncontroverted that the Buyers had never reached an agreement in writing delineating their respective ownership rights in WRLT (FM). It is undisputed, however, that William Barry would become the sole owner of WHNK (AM) upon closing of the sale.
 
 
 4
 Transfers of ownership interests in radio stations must be approved by the Federal Communications Commission ("FCC"). Accordingly, the Agreement required that the Buyers submit certain completed FCC forms to the Receiver, who would forward them to the FCC as part of the application process. The application included a document known as FCC Form 314, which requires the disclosure of information regarding the intended ownership interests of the station upon transfer of the license. Identification of the ownership interests is critical to the FCC's evaluation of the application.
 
 
 5
 Horton and Turner submitted an FCC application to the Receiver's counsel, Linda Eckard, on March 16, 1993--the last day for filing the application pursuant to the Agreement. Form 314 of the application identified Horton and Turner as the sole owners of the station after closing of the Agreement. An exhibit to that application, however, made reference to a dispute over ownership in the station. Malkan and OBA informed Eckard on March 17, 1993 of their objection to the Horton/Turner application. Shortly thereafter, Malkan and OBA submitted a separate FCC application, indicating ownership interests significantly different from those contained in the Horton/Turner application.
 
 
 6
 The Receiver, noting the disparities in the two applications, decided not to tender either application to the FCC because of potential problems associated with an incorrect selection and the likelihood of unfavorable review by the FCC. Faced with an obvious dispute among the Buyers over an essential issue, the Receiver, on March 18, 1994, gave notice to the Buyers that their failure to provide a satisfactory FCC application by March 16, as required by the Agreement, rendered them in default thereunder. The conditions for curing the default were listed in the March 18th letter. In that same letter, the Receiver notified the parties of his intent to terminate the Agreement unless the default was cured.
 
 
 7
 The next day, Malkan and OBA submitted yet another FCC application to the Receiver, which varied not only from the Horton/Turner application but also from Malkan's original application. Moreover, this third application failed to resolve the Buyers' disputes, as evidenced by the application itself and Malkan's subsequent actions.
 
 
 8
 After the submission of the third application, Malkan and OBA filed a complaint for injunctive relief in the Chancery Court for Davidson County, Tennessee. In that action, they sought to compel Horton and Turner to "consent"--and thus join in--the application submitted by Malkan and OBA. Concerned that the selection of one group's application over the other's would cause the receivership action to become embroiled in litigation, and hence delay the sale of the station, the Receiver terminated the Agreement in a letter dated March 24, 1993, noting therein that the default had not been properly cured as demanded in the letter of March 18. Acting on Malkan's request, the Chancery Court issued an injunction on March 31 ordering Horton and Turner to withdraw their FCC application and consent to the second application submitted by Malkan and OBA. The Chancery Court did not, however, determine the respective ownership interests of the parties. Notwithstanding the Chancery Court injunction, the Receiver declined to change his position on the status of the Agreement.
 
 
 9
 On March 31, 1993, the Receiver petitioned the district court for approval of his termination of the Agreement and for the authority to sell the AM station to William Barry. Malkan and OBA filed a motion to dismiss the Receiver's petition to terminate the Agreement. Horton and Turner filed a response to the Receiver's petition in which they asked that the district court (1) grant the Receiver's request to sell the AM station; (2) deny the Receiver's request to terminate the original Agreement; and (3) grant a hearing on whether Malkan and OBA should be allowed to participate in the purchase of radio station WRLT (FM). Apparently in response to the Horton/Turner motion, Malkan and OBA filed a second motion in Chancery Court on April 26, 1993, requesting a modification of the original injunction. At this stage in the proceedings, they sought to enjoin Horton and Turner from taking any position in the receivership action that objected to Malkan and OBA's second FCC application, or Malkan and OBA's participation in the purchase of the FM radio station in accordance with the original Agreement. Upon motion of the Receiver, and before the Chancery Court could modify its injunction, the district court issued a temporary restraining order enjoining Malkan and OBA from interfering in the receivership action through the Chancery Court.
 
 
 10
 On July 13, 1993, the district court conducted a hearing on the Receiver's petition and Malkan and OBA's motion to dismiss the petition and counterclaim. Sometime thereafter, the district court vacated the temporary restraining order and issued a memorandum and order approving the Receiver's decision to terminate the Agreement and granting the Receiver's petition to sell the AM radio station to William Barry. Malkan and OBA filed their notice of appeal on November 29, 1994. On December 16, 1994, the district court entered an order confirming the sale of the AM radio station to William Barry. Malkan and OBA also appeal that order.
 
 II
 
 11
 The parties agree that the sole issue before this Court is whether the district court erred in granting the receiver's request to terminate the Agreement. The parties also agree that the central issue is whether the time period given to cure the appellants' breach was reasonable, which is a mixed question of law and fact. See K & M Joint Venture v. Smith Int'l, Inc., 669 F.2d 1106, 1111-1112 (6th Cir.1982) (question of whether buyer provided reasonable notice to seller of claimed breach of warranty is a mixed question of law and fact). We thus review de novo the district court's conclusion that the time period given to cure was reasonable.
 
 III.
 
 12
 Our analysis must start with the Agreement itself. The Agreement contained a condition that required the Buyers to submit Section Two of the FCC Form 314 application to the Receiver within fifteen business days from the district court's approval of the sale. Specifically, the Agreement provides:
 
 
 13
 No later than fifteen business days after the District Court's approval of this agreement, the Buyers and the Seller shall file the FCC application. Seller and Buyers shall prosecute the FCC Application with all reasonable diligence and otherwise use their reasonable best efforts to obtain the grant of the FCC Application as expeditiously as practicable.
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 This agreement may be terminated by mutual written consent of the parties hereto or by either Buyers or Seller, if the party seeking to terminate the agreement is not in material default or breach of this agreement, upon written notice to the other upon the occurrence of any of the following:
 
 
 17
 (d) if by the Seller, prior to Closing Date, the Buyers default in any respect in the observance or in the due and timely performance of any of its covenants or agreements herein contained and such default is not promptly cured.
 
 
 18
 Thus, submission by the Buyers of Form 314 was critical.
 
 
 19
 The Agreement states at paragraph 16.7: "The construction and performance of this Agreement shall be governed by the laws of the State of Tennessee ..." Although the Agreement failed to specify the period of cure, under the law of Tennessee the Buyers were entitled to a reasonable amount of time. Houston Bros. v. Dickson Planing Mill Co., 159 Tenn. 10, 13, 15 S.W.2d 749, 750 (Tenn.1929); Lamborn & Co. v. Green & Green, 150 Tenn. 38, 45, 262 S.W. 467, 469 (Tenn.1923) ("[W]here the time fixed by the contract for performance is permitted to pass ... the time of performance thereafter becomes indefinite, and one party cannot put the other in default except upon notice and a reasonable time for performance given."); E. Allen Farnsworth, Farnsworth on Contracts § 8.18 (1990) ("Fairness ordinarily dictates that the party in breach be allowed a period of time--even if only a short one--to cure the breach if it can."); see also McClain v. Kimbrough, 806 S.W.2d 194, 198 (Tenn.Ct.App.1990) (Tennessee courts have imposed upon contractors the obligation to give subcontractors a reasonable opportunity to perform).
 
 
 20
 What is a reasonable amount of time must be determined by the facts of each case. Lamborn & Co., 150 Tenn. at 45, 262 S.W. at 469. The Receiver gave the Buyers approximately one week (March 18, 1993 to March 24, 1993) to cure the default. This was sufficient time for the Buyers to resolve their dispute over ownership and tender an uncontested FCC application to the Receiver. Instead, Malkan and OBA filed various motions and petitions in state and federal court, and Horton and Turner proceeded in a similar fashion. They thus failed to cure the default in the week prior to termination.
 
 
 21
 Malkan and OBA argue that the Chancery Court's injunction cured the default. However, the Chancery Court's injunction failed to resolve the dispute among the Buyers. That court did not address the respective ownership interests of the parties, an issue that needed to be resolved in the FCC application process, nor did the Chancery Court resolve the question of management of the radio station. Until the Buyers' internal dispute was resolved, the Receiver simply could not determine which application accurately described the ownership interests of the parties. Thus, this default created the possibility that the Receiver would be subjected to additional litigation, or an indefinite delay in FCC approval of the sale if he were to select one application over the other.
 
 
 22
 Under the terms of the Agreement, the Receiver was entitled to a timely application; the Buyers failed to provide one. The Receiver was not required to referee the Buyers' internal dispute. Instead, the Receiver's responsibility was to act in the best interest of the estate. See, e.g., Ralph E. Clark, A Treatise on the Law and Practice of Receivers, 3rd Ed., I § 166 (1959). The Buyers' failure to cure the breach, their ongoing internal dispute, and the very real possibility that a complex litigation battle would continue ad infinitum, provided the Receiver with the justification to terminate the Agreement as he did. See Farnsworth, supra, § 8.18 ("The injured party need not suspend performance indefinitely, however. After some period of time, the injured party can put an end to the contract by terminating it.").
 
 
 23
 Further, when a breaching party should need no time to comply with a demand to cure, that party must cure without further delay. Houston Bros., 159 Tenn. at 13, 15 S.W.2d at 750; Lamborn & Co., 150 Tenn. at 46, 267 S.W. at 469. Malkan and OBA cannot justifiably claim that the Receiver was required to wait until the Buyers resolved their internal dispute; hence the Buyers could and should have cured the default without further delay. In sum, we conclude that the district court did not err as a matter of law when it allowed the receiver to terminate the Asset Purchase Agreement. For the foregoing reasons, the order of the district court is AFFIRMED.